Samuel NOVOA–UMANIA, Petitioner,

v.

IMMIGRATION AND NATURALIZA-
TION SERVICE, Respondent.

No. 89–1623.

United States Court of Appeals,
First Circuit.

Heard Dec. 5, 1989.
Decided Feb. 15, 1990.

Deborah M. Cerullo, Cambridge, Mass.,
with whom William H. Miller and Emmanu-
el Legal Services were on brief, for peti-
tioner.

Maureen O'Sullivan, Jeremiah Friedman,
Harvey Kaplan, Washington, D.C., and
Law Office of Harvey Kaplan, were on
brief for American Immigration Lawyers
Ass'n and Nat. Immigration Project of the
Nat. Lawyers Guild, amici curiae.

Alice M. Smith with whom Stuart M.
Gerson, Asst. Atty. Gen., Mark C. Walters,
Asst. Director, and Alison P. Drucker,
Dept. of Justice, Civil Div., Office of Immi-
gration Litigation, Washington, D.C., were
on brief, for respondent.

Before BOWNES, BREYER and SELYA, Circuit Judges.

BREYER, Circuit Judge.

■ The issue in this case is whether the Immigration and Naturalization Service could find, on the basis of the record facts, that Samuel Novoa Umania, the petitioner, failed to show a "well-founded fear" that he faces persecution "on account of" his "membership in a particular social group, or political opinion" if he returns to El Salvador. *See* 8 U.S.C. § 1158(a) (giving Attorney General discretionary authority to grant asylum to otherwise deportable alien who qualifies as a "refugee"); 8 U.S.C. § 1101(a)(42)(A) (defining "refugee"). The Board of Immigration Appeals, acting on the Attorney General's behalf, has held that the record does not demonstrate a "well-founded fear" of such persecution. It said, in essence, that Novoa failed to show that "a reasonable person in his circumstances would fear persecution." *See Carcamo–Flores v. INS*, 805 F.2d 60, 68 (2d Cir.1986); *Guevara–Flores v. INS*, 786 F.2d 1242, 1249 (5th Cir.1986), *cert. denied*, 480 U.S. 930, 107 S.Ct. 1565, 94 L.Ed.2d 757 (1987); *Matter of Mogharrabi*, Interim Decision 3028 (BIA 1987). In the absence of this requisite threshold finding, the Attorney General could not exercise his discretionary authority to permit Novoa to stay in the United States. *See INS v. Cardoza–Fonseca*, 480 U.S. 421, 428, 107 S.Ct. 1207, 1211, 94 L.Ed.2d 434 (1987) (deportable alien must show "well-founded fear of persecution" as precondition for exercise of discretionary asylum authority). *Cf.* 8 U.S.C. § 1253(h); *INS v. Stevic*, 467 U.S. 407, 429–30, 104 S.Ct. 2489, 2501, 81 L.Ed.2d 321 (1984) (where deportable alien shows such persecution is "more likely than not," the government *must* withhold deportation).

Novoa asks us to review the Board's finding. He argues that his evidence was strong enough to require the Board to find that he feared the relevant persecution and that that fear was "well-founded." In particular, he says that the record shows a "well-founded fear" of persecution because of his "political" stance of neutrality. We have reviewed the record, fully aware that we must uphold any finding of fact that is supported by "substantial evidence," *Diaz–Escobar v. INS*, 782 F.2d 1488, 1492–93 (9th Cir.1986), and that we must also respect the Board's legal decision that the facts, as found, fall outside the scope of the relevant statutory phrase, "well-founded fear." *See Cardoza–Fonseca*, 480 U.S. at 448, 107 S.Ct. at 1221 (where "the agency is required to apply ... [statutory] standards to a particular set of facts[,] ... the courts must respect the interpretation of the agency"). Having examined the record, we find the issue a close one, but we cannot say that the Board's determination is unlawful.

The Board basically accepted Novoa's claims about the underlying facts of what had happened to him in the past. Those underlying facts fall into three separate categories. First, Novoa made certain factual assertions designed to show that his life is in danger:

1. In the late 1970's and early 1980's Novoa lived in Canton San Jacinto, El Salvador.

2. In August 1979 guerrillas came to his house at night. They asked him who, in the village, had a silver metal revolver. They threatened to kill him unless he told. They took him and another man to the center of the village. The other man, afraid for his life, told them who had guns.

3. In March 1980 guerrillas broke into his house, stealing things, and as a result Novoa had to sleep in the hills.

4. In June 1980 he had to stay inside his house while the guerrillas unloaded supplies nearby, and he felt in danger of being killed.

5. In March 1982 the guerrillas threatened the village residents that, if they voted in the elections, the guerrillas would kill them, cut off their hands, or beat them. Petitioner voted in the elections.

6. In April 1983 the guerrillas pressured him to help them, threatening to take everything he had if he did not cooperate.

7. In October 1983 the guerrillas interrogated and beat his cousin, asking the cousin whether petitioner favored the army. They later released the cousin.

8. In March 1984, when the guerrillas occupied the village, the government air force bombed it. A bomb destroyed part of petitioner's house.

A second set of facts suggested that each side in El Salvador's civil war thinks petitioner supports the other side. These facts include the following:

1. After the 1979 "revolver search" incident many people in the village thought he supported the guerrillas.

2. In 1981 the guerrillas thought he was "an ear" for the Army, but the Army, arriving in the village, said he was supporting the guerrillas.

3. In April 1983 the Army thought he was on the guerrillas' side and "registered" him.

4. When the guerrillas interrogated petitioner's cousin in 1983, they insisted to the cousin that petitioner must have something to do with the Army.

5. In January 1984 the Army surrounded his house, treated him like "a great criminal," accused him of supporting the guerrillas, threatened to kill him, and "registered" him again.

A third set of facts, which the INS relied upon in making its findings, helps support the contrary conclusion, that petitioner does not face political persecution. These facts include the following:

1. Petitioner left El Salvador in early 1984 with a passport and visa for Guatemala. He came to the United States illegally. He was deported. He returned to El Salvador and lived in its capital city, apparently without incident, from March until October 1984.

2. During this time family and friends took care of his house. The petitioner also traveled from San Salvador to his own canton to take care of his property.

3. His brothers and parents still live in El Salvador.

■ As we have said, petitioner argues that these facts require the Board to find that he has a "well-founded fear" that he will be persecuted because of his "political opinion" of "neutrality." We assume, as the Board apparently did, that in appropriate circumstances "neutrality" may fall within the scope of the statute's words "on account of ... political opinion." *See Bolanos–Hernandez v. INS,* 767 F.2d 1277, 1286 (9th Cir.1984); *Argueta v. INS,* 759 F.2d 1395, 1397 (9th Cir.1985). Nonetheless, we do not see how a petitioner such as Novoa, claiming asylum on the basis of "neutrality," could bring himself within the statute's terms unless he can demonstrate that a reasonable person would fear one of the following: 1) that a group with the power to persecute him intends to do so specifically because the group dislikes neutrals, or 2) that such a group intends to persecute him because he will not accept its political point of view, or 3) that one or more such groups intend to persecute him because each (incorrectly) thinks he holds the political views of the other side.

■ The record in this case does not support the first of these claims. There is no evidence that either the guerrillas or the government persecutes neutrals simply because they dislike neutrals. Nor can we say, giving proper weight to the Board's determinations, that the law requires the Board to find that Novoa has a "well-founded" fear that the government of El Salvador will persecute him either because he does not accept its political point of view or because it (wrongly) believes he favors the guerrillas. On the one hand, the record shows that in April 1983 the Army thought he was on the side of the guerrillas and registered him, and in January 1984 the Army treated him like a "great criminal," threatened to kill him, and registered him again. On the other hand, subsequent to those events (which apparently took place in his village), Novoa lived for more than six months in San Salvador, the nation's capital, without incident; and, during that time, the government apparently gave him a passport with a visa for Guatemala. Given this subsequent history, the Board might conclude that the earlier events reflected the violent nature of the civil war

and do not represent an ongoing threat of persecution as a guerrilla supporter should Novoa return.

The most difficult evidentiary question is whether or not the facts demonstrate a "well-founded" fear that the guerrillas would persecute Novoa, either because he refuses to accept their point of view or because they believe he supports the government. On the one hand, the record shows that the guerrillas threatened to kill Novoa (unless he told them who had guns) in August 1979 and again (if he voted) in March 1982; in April 1983 they pressured him by threatening to take everything he had; in October 1983 they questioned and beat his cousin; and, on several occasions during this time, they spoke and acted as if they thought he supported the government. On the other hand, the 1979 who-has-guns death threat seems tied to a particular place and circumstance. The 1982 do-not-vote death threat is eight years old, seems similarly tied, and lacks accompanying evidence showing the guerrillas held a grudge; there is no indication, for example, that they subsequently injured others who voted (though they apparently were near or controlled the relevant village for a time). The 1983 threats are described only in vague terms, permitting an inference that they amounted to no more than recruitment efforts similarly related to a particular time and place. One would also find support for a "time-bound local circumstance," rather than a "grudge, threatening special persecution years later," interpretation of these events in the fact that Novoa, after these events, while living in San Salvador, returned to his native village without incident to look after his property.

Were we deciding simply whether this evidence shows a "well-founded fear" of persecution, we might disagree with the Board; but, the law does not permit us to make this finding. Rather, we must decide whether the Board itself, given its Congressional mandate and the legal requirement that we show its decisions of this sort considerable respect, could reasonably conclude that the evidence was insufficient. See Cardoza–Fonseca, 480 U.S. at 448, 107 S.Ct. at 1221. We think it could. One might 1) reason that Novoa, were he to return now to El Salvador, would take up the sort of life he most recently led, 2) add to it the fact of his having lived in San Salvador and traveled to his village in 1984 without further threat or harm, 3) view some of the earlier threats as nonspecific and others as related to a special time and circumstance, and 4) conclude that Novoa's fear of *persecution* now, seven to ten years later, because of the guerrillas' much earlier possible belief that he supported the government, is not "well-founded."

In reaching this conclusion, we have examined cases from other circuits, particularly the Ninth Circuit, which has decided several similar cases. In some of those cases the Circuit has remanded a matter to the Board so that it can consider whether evidence of the sort present here shows a "well-founded fear" of the relevant persecution. These cases do not *require* the Board to make such a finding; and, for that reason, they are not directly in point. See Arteaga v. INS, 836 F.2d 1227 (9th Cir.1988) (remanding case to Board to determine whether similar threat could create well-founded fear where Board had applied incorrect standard); Hernandez–Ortiz v. INS, 777 F.2d 509 (9th Cir.1985) (remanding case to Board so that it could consider whether, in the circumstances, a similar type of threat created a "well-founded fear" of persecution). See also United States v. Santos–Vanegas, 878 F.2d 247, 252 (8th Cir.1989) (setting aside criminal conviction because "it seems quite possible" that the Board would have found a "well-founded fear" in somewhat similar circumstances had it used the correct standard).

In certain other cases, the Ninth Circuit has *required* the Board to find a "well-founded fear;" but, judging from the opinions, we believe the evidence in those cases favored the petitioner more strongly than the evidence before us. In *Bolanos–Hernandez*, for example, the case most favorable to the petitioner, the Ninth Circuit's opinion describes a specific threat the guerrillas made to kill the petitioner if he did not join them, and it notes that the guer-

rillas had previously killed five of petitioner's friends. 767 F.2d at 1280. The case does not contain evidence that petitioner continued to live in El Salvador, visiting the locality from time to time, without harm. In *Argueta*, the court speaks of an anti-guerrilla "death squad" that believed petitioner was a guerrilla, that specifically threatened to kill the petitioner, and that backed up the threat by torturing and killing his brother-in-law. 759 F.2d at 1395–96. (The court then remanded the case for findings about witness credibility.) *See also Canjura–Flores v. INS*, 784 F.2d 885 (9th Cir.1985) (clear probability of persecution existed where government killed petitioner's uncle and government agents came to petitioner's house looking for him). Again, in light of our examination of the record, we think the Board in this case could have found the threats at issue here less "viewpoint based," more context specific, more likely to reflect battlefield exigencies, and consequently less likely to reflect a well-founded fear of a continued threat of persecution based upon a political viewpoint, than the threats in the relevant Ninth Circuit cases.

Petitioner makes two additional arguments. He says: 1) that he will be persecuted because of his membership in the "social class" of small landholders, and 2) that he will be persecuted because he has asked for asylum in the United States. The Board, however, could reject the first claim in light of the scanty evidence about petitioner's "social class," along with the fact that petitioner lived without incident for over six months in El Salvador, while visiting his village to tend his livestock. *See Rodriguez–Rivera v. INS*, 848 F.2d 998, 1006 (9th Cir.1988) (substantial evidence supporting denial of asylum included fact that petitioner lived undisturbed for two months after guerrilla threat). The Board could reject the second claim in light of the record's failure to contain evidence that would substantiate it.

The government does not, and could not, claim that petitioner's deportation lacks risks of hardship, injury, even death. But neither can we say that Congress has granted asylum to all those in El Salvador who currently undergo the hardships that civil war has imposed upon them. Rather, Congress has limited its grant of asylum to those who show a "well-founded fear" of persecution for certain specified reasons, such as "political opinion." Congress has entrusted to the Department of Justice (and, through subdelegation, to Immigration Judges and the Board of Immigration Appeals) the job of making the relevant fact-related determinations. We cannot say that the law forbids the BIA to make the decision it has made in this case.

Since the government has not opposed the petitioner's request that he be allowed to depart voluntarily, as the Board previously authorized, we direct the government to treat the 30–day voluntary departure period as beginning to run on the date this court's mandate becomes effective. Compare our discussion of this matter in *Umanzor–Alvarado v. INS*, 896 F.2d 14 (1st Cir.1990). His petition for review, however, is

*Denied.*