Valli Kandiah RAVINDRAN, Petitioner,

v.

IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.

No. 91–2055.

United States Court of Appeals,
First Circuit.

Heard May 6, 1992.
Decided Sept. 30, 1992.

Gerald D. Wall, Greater Boston Legal Services, Boston, Mass., with whom Miriam Kelliher, Somerville, Mass., was on brief for petitioner.

Charles E. Hamilton, III, Office of Immigration Litigation, Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Civil Div., and David J. Kline, Asst. Director, Office of Immigration Litigation, Washington, D.C., were on brief for respondent.

Before SELYA, Circuit Judge, CAMPBELL, Senior Circuit Judge, and PETTINE,* Senior District Judge.

LEVIN H. CAMPBELL, Senior Circuit Judge.

Petitioner Valli Kandiah Ravindran, a citizen of Sri Lanka, petitions for review of an order of the Board of Immigration Appeals which denied his request for political asylum and withholding of deportation. We have jurisdiction to hear his appeal pursuant to Section 106(a) of the Immigration and Nationality Act ("the Act"), 8 U.S.C. § 1105a(a). *See Ipina v. I.N.S.*, 868 F.2d 511, 513 n. 5 (1st Cir.1989). Because substantial evidence supports the BIA's decision, we deny the petition for review.

## I. BACKGROUND

Petitioner is a 26–year–old unmarried male native and citizen of Sri Lanka. The population of Sri Lanka is comprised mainly of two ethnic groups, the Sinhalese—Buddhists who constitute a majority of Sri Lankans and have controlled the national government since 1971—and the Tamils—Hindus who constitute only eighteen percent of the population and are subject to various forms of discrimination by the Sinhalese. During the 1980s, tensions between the two groups rose as Tamils pressed for autonomy in the northern and eastern provinces. Sri Lankan security forces have been accused of human rights abuses, including the torture and killing of ordinary citizens in their efforts to defeat militant Tamil groups, such as the Liberation Tigers of Tamil Eelam. Attempts by the Indian government to enforce a peace accord between the Sri Lankan government and the separatist Tamil groups appear only to have escalated the violence and further destabilized the political situation in Sri Lanka.

Petitioner is a member of the Tamil minority. In his application for asylum, he claimed that he fears persecution in Sri Lanka because of his political opinion. At his deportation hearings, petitioner pointed to two particular encounters with the au-thorities as evidence of past government persecution of him. In 1982, when he was seventeen, petitioner joined a political organization, the Non–Violent Direct Action Group ("the NVDAG"). He participated in various group activities, such as first aid training, but was not a leader of the group, nor was he ever stopped or questioned by authorities while passing out NVDAG pamphlets to his fellow students. In August, 1984, he helped the NVDAG organize a one-day hunger strike in a public square to protest recent killings of civilians by government forces. The strikers were not harassed or arrested during the meeting. On his way home later that evening, however, petitioner and two or three others were arrested by soldiers and taken to a prison. At his deportation hearings, petitioner testified that, at the time of his arrest, he was on the streets after the local 5:00 p.m. curfew. Petitioner was detained at the prison for three days, where he was interrogated and hit by soldiers. Upon his release, one of the prison authorities told him to avoid political activities. Petitioner offered no evidence to elaborate on this statement, to explain the nature of the interrogation, nor to describe whether he was injured by the soldiers.

In a separate incident, soldiers shot at and chased a group of people from the street, including petitioner. The soldiers caught petitioner, but released him after he identified himself as a student. Petitioner testified that the authorities did not know he was a member of the NVDAG at the time of either incident.

Petitioner also presented evidence about other incidents which affected his family in particular and Tamils in general. For example, he witnessed acts of random violence by soldiers against civilians. His brother-in-law was wounded when soldiers fired into a crowd of Tamils. His uncle was imprisoned for one year and his uncle's house was destroyed in apparent punishment for the uncle's activities in the Tamil United Liberation Front, a political party which advocated a separate Tamil state. Petitioner's family's house was searched

---

* Of the District of Rhode Island, sitting by desig- nation.

twice in the years he lived there; he testified, without elaboration, that during one search the soldiers "were looking for me, but I could not be found."

In November, 1985, more than one year after his three-day detention, petitioner flew to Bogota, Columbia, where he signed onto a Greek ship as a crewman. He had obtained a Sri Lankan passport and exit visa without trouble. Petitioner worked on the ship for five months on its shipping runs between North and South America, going ashore in Venezuela, Uruguay, Colombia, Brazil and Puerto Rico. He never asked for asylum in any of these ports. He left the ship permanently in Boston on April 28, 1986, because of fights with and threats by other Sri Lankan crewmen who were Sinhalese. The Immigration and Naturalization Service ("the I.N.S.") authorized him to enter the United States on a 29–day transit visa. Petitioner lived and worked in the Boston area until October, 1986, when he was arrested for shoplifting. After being notified, the I.N.S. served petitioner with an order to show cause why he should not be deported. Petitioner never applied for, nor asked U.S. officials about, asylum until after he was served with the show cause order.

At the show cause hearing, petitioner conceded deportability, but requested asylum and withholding of deportation. At a series of seven hearings spanning two years before an Immigration Judge, petitioner presented testimony and documentary evidence to support his request. On November 2, 1989, the Immigration Judge ruled that petitioner did not statutorily qualify for asylum under Section 208(a) of the Act, 8 U.S.C. § 1158(a), finding that his testimony was not credible, and, even if it were, he failed to establish that he had a "well-founded fear of persecution" because of his race, religion, nationality, membership in a particular social group, or political opinion.[1] The Immigration Judge also found that petitioner was not entitled to withholding of deportation under Section 243(h) of the Act, 8 U.S.C. § 1253(h), because he failed to show a clear probability that his life or freedom would be threatened if he were deported.[2] The Immigration Judge did grant petitioner's request for voluntary departure within three months in lieu of deportation. The Board of Immigration Appeals ("the BIA"), after a *de novo* review of the record, agreed with the Immigration Judge's decision and dismissed petitioner's appeal on July 26, 1991.[3] The BIA also revised the voluntary departure period to thirty days. Petitioner filed a timely petition for review to this court.

1. Section 208(a) of the Act, 8 U.S.C. § 1158(a), provides in relevant part:
 The Attorney General shall establish a procedure for an alien physically present in the United States ..., irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title.
 8 U.S.C. § 1101(a)(42)(A) defines "refugee," in relevant part, as:
 any person who is outside any country of such person's nationality ... and who is unable or unwilling to return to ... that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion....

2. Section 243(h) of the Act, 8 U.S.C. § 1253(h), provides in relevant part:
 The Attorney General shall not deport or return any alien ... to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.

3. Petitioner urges us to review the findings of the Immigration Judge, in addition to those of the Board. His argument is based on the claim that the Board "affirmed the determination of the Immigration Judge with only a conclusory discussion of the legal issues." Reply Brief of Petitioner at 9. Any errors made by the Immigration Judge essentially poisoned the Board's findings, he argues, and thus we should review the Immigration Judge's rulings.
 We do not agree that the Board did no more than cursorily affirm the Immigration Judge's decision. The lengthy, well-reasoned opinion by the Board indicates that it made a *de novo* review of the record and did not merely rely on the Immigration Judge's allegedly "faulty assessment of the evidence." *Id.* We see no need to focus on more than the Board's own findings.

## II. DISCUSSION

### A. *Eligibility for Asylum*

As one of his arguments before us, petitioner asserts that the BIA erred in not granting him political asylum. According to petitioner, the record is without substantial evidence to support the BIA's finding that he was statutorily ineligible for asylum.

#### 1. Applicable Law

■ An alien may be granted asylum in the discretion of the Attorney General if the alien is a "refugee." *See* 8 U.S.C. § 1158(a). "Refugee" is defined, in relevant part, as any alien who is unwilling or unable to return to his country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Petitioner bears the burden of proof. 8 C.F.R. § 242.17(c)(4)(iii); *Alvarez–Flores v. I.N.S.*, 909 F.2d 1, 3 (1st Cir.1990). Finding an alien to be a refugee does no more than establish that he may be granted asylum in the discretion of the Attorney General. *I.N.S. v. Cardoza–Fonseca*, 480 U.S. 421, 443, 107 S.Ct. 1207, 1219, 94 L.Ed.2d 434 (1987).

■ A petitioner can establish that he is a refugee by showing either past persecution or a well-founded fear of persecution in the future on the basis of one of the enumerated grounds. *See Desir v. Ilchert*, 840 F.2d 723, 729 (9th Cir.1988). While the contours of the well-founded fear standard have not been precisely defined, *see Ipina*, 868 F.2d at 514 n. 6, it has both a subjective and objective component. *See Alvarez–Flores*, 909 F.2d at 5. The subjective component requires that the asserted fear be genuine. The objective component, on the other hand, contemplates that the applicant show " 'by credible, direct, and specific evidence, ... facts that would support a reasonable fear that the petitioner faces persecution.' " *Alvarez–Flores*, 909 F.2d at 5 (*quoting Diaz–Escobar v. I.N.S.*, 782 F.2d 1488, 1492 (9th Cir.1986)). In contrast to the higher standard for the withholding of deportation, to qualify for asylum an alien is not required to prove that it is more likely than not that he will be persecuted. *See Cardoza–Fonseca*, 480 U.S. at 449, 107 S.Ct. at 1222. The petitioner need show only that his fear is genuine and reasonable. *Khalaf v. I.N.S.*, 909 F.2d 589, 591 (1st Cir.1990).

#### 2. Standard of Review

■ Decisions of the BIA denying asylum are judicially reviewed in two steps. At the threshold, a court will affirm findings by the BIA that an applicant is not a refugee if there is substantial evidence to support that determination. *See Alvarez–Flores*, 909 F.2d at 3; *Novoa–Umania v. I.N.S.*, 896 F.2d 1, 2 (1st Cir.1990). "Under this deferential standard, we may not reverse the Board simply because we disagree with its evaluation of the evidence; if the Board's conclusion is substantially reasonable, we must affirm it." *Khalaf*, 909 F.2d at 591. The Supreme Court recently emphasized how deferential this standard is: "if [an alien] seeks to obtain judicial reversal of the BIA's determination, he must show that the evidence he presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *I.N.S. v. Elias–Zacarias*, —— U.S. ——, ——, 112 S.Ct. 812, 817, 117 L.Ed.2d 38 (1992).

■ If petitioner were to qualify as a refugee but were denied asylum as a discretionary matter, a court would review the BIA's denial of asylum under an "abuse of discretion" standard. *See Ipina*, 868 F.2d at 513. Here, however, since the BIA determined that petitioner was not a refugee, it had no occasion to examine his asylum request on a discretionary basis. Our review, therefore, is simply whether reasonable evidence supports the BIA's finding that petitioner did not suffer past persecution or have a well-founded fear of persecution if returned to Sri Lanka.

#### 3. Analysis

We find substantial evidence to support the BIA's finding that Mr. Ravindran failed to prove past persecution or a well-founded

fear of persecution on one of the grounds enumerated in the Act. In doing so, we shall assume that his entire testimony was credible, and thus need not review the adverse credibility determinations of both the BIA and the Immigration Judge.

Petitioner cites three grounds for his claim that he qualifies as a refugee under Section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A). First, he argues, he was persecuted in the past and fears future persecution because of his political opinions. For evidence of this, he points primarily to his membership and participation in the NVDAG, his imprisonment for three days in 1984 after the hunger strike, and the other brief encounter with Sri Lankan soldiers.

██ However, there is substantial support for the Board's finding that petitioner failed to show he was singled out for persecution or that any persecution he did suffer was related to his political opinions. *See, e.g., Elias–Zacarias,* —— U.S. at ——, 112 S.Ct. at 817 (stating that petitioner must provide some direct or circumstantial evidence of his persecutors' motives). No evidence shows that government authorities ever took any action against the NVDAG or its members. The hunger strike in 1984 took place without incident, and petitioner never encountered trouble distributing his pamphlets. Petitioner admitted that his arrest and three-day detention may have been due to a curfew violation, that the local authorities regularly arrested curfew violators, and that the authorities did not even know he was involved with the NVDAG. *See Rodriguez–Rivera v. United States Dept. of Immigration & Naturalization,* 848 F.2d 998, 1005 (9th Cir.1988) (stating that governmental enforcement of a law which applies to all citizens does not constitute persecution on account of petitioner's political opinion); *cf. Zalega v. I.N.S.,* 916 F.2d 1257, 1260 (7th Cir.1990) (finding that repeated detentions and interrogations by police, without formal charges, torture or threats, did not constitute "persecution"); *Mendez–Efrain v. I.N.S.,* 813 F.2d 279, 282–83 (9th Cir.1987) (finding substantial evidence to deny asylum despite evidence

of a four-day detention and interrogation). Except for the vague statement by a prison official upon petitioner's release that he should avoid political activities, no other facts were offered to show that the authorities ever questioned petitioner about, or even knew about, his political activities or opinions.

Petitioner's other brushes with the government are insufficient to compel finding a reasonable fear of being singled out for persecution. Sri Lankan authorities often stopped citizens, including petitioner, on the street or at his school. Except for the one arrest, petitioner was always allowed to go after a brief detainment on the street. Petitioner provided no evidence that he or his family were ever persecuted because of his uncle's political activities, nor that the government has a general practice of persecuting extended family members. The fact that petitioner's brother-in-law was wounded by soldiers firing upon a crowd demonstrates only the tragic and violent nature of the civil unrest in Sri Lanka, not that the petitioner should reasonably fear persecution because of his political beliefs. *See Arriaga–Barrientos v. United States I.N.S.,* 937 F.2d 411, 414 (9th Cir.1991) (stating that violence against a petitioner's family may establish a well-founded fear of persecution only if "a pattern of persecution closely tied to the petitioner" is shown). Similarly, witnessing the killing of innocent civilians by the military is horrifying, but does not substantiate a claim of persecution. *See Rodriguez–Rivera,* 848 F.2d at 1006 ("Knowledge of random violence does not substantiate a claim of persecution under the immigration laws.") Generally, evidence of widespread violence and human rights violations affecting all citizens is insufficient to establish persecution. *See Mendez–Efrain,* 813 F.2d at 282; *Chavez v. I.N.S.,* 723 F.2d 1431, 1434 (9th Cir.1984); *Martinez–Romero v. I.N.S.,* 692 F.2d 595, 595–96 (9th Cir.1982).

In addition to the evidence discussed above, other facts in the record undercut petitioner's claim that he has a well-founded fear of persecution. Petitioner's entire family, which was never harmed nor threatened because of him, continues to

live on the same farm in Sri Lanka. *See Alvarez–Flores,* 909 F.2d at 5; *Mendez–Efrain,* 813 F.2d at 282–83. Furthermore, the facts that he continued to live in Sri Lanka undisturbed for one year after the alleged persecution, *see Alvarez–Flores,* 909 F.2d at 5; *Novoa–Umania,* 896 F.2d at 3; *Rodriguez–Rivera,* 848 F.2d at 1006, that petitioner obtained a passport and exit visa and then left Sri Lanka without incident, *see Alvarez–Flores,* 909 F.2d at 5; *Novoa–Umania,* 896 F.2d at 3–4; *Ipina,* 868 F.2d at 514–15, and that the Sri Lankan government did not warn him not to return to Sri Lanka, *see Mendez–Efrain,* 813 F.2d at 281, support the Board's finding that a reasonable person would not fear future persecution.[4]

Overall, the record provides substantial evidence for the BIA's finding that petitioner did not suffer past persecution or have a well-founded fear of persecution because of his political opinion.

 The second basis offered in support of petitioner's asylum claim is a fear of persecution on account of a political opinion imputed to him by the government, namely, that he supports the extreme, militant Tamil organizations. An imputed political opinion, whether correctly or incorrectly attributed, may constitute a reason for political persecution within the meaning of the Act. *Alvarez–Flores,* 909 F.2d at 4. Petitioner claims that, because of his activities in the NVDAG, the military will attribute to him an opinion in support of militant Tamils. He says that the government's treatment of his uncle, brother-in-law and himself demonstrates the reasonableness of his fear of being perceived as a militant supporter. However, petitioner offered no specific facts to prove that the government does, in fact, treat NVDAG members as if they supported the militant Tamil groups. Similarly, the random shooting of his broth-

er-in-law, and the imprisonment of his uncle for his active role in a prominent Tamil political party, do not show that the Sri Lankan government will perceive petitioner as a militant simply because he once belonged to a group which advocates peace. As discussed *supra,* petitioner also failed to show that his own encounters with the authorities had anything to do with his political beliefs, whether actual or imputed. Thus, the BIA permissibly concluded that he failed to meet his burden of proof on the claim of imputed political opinion.

Petitioner further argues that he has a well-founded fear of persecution on account of his membership in a particular social group, namely, "Tamil males between the ages of fifteen and forty-five." He asserts that, as a young male Tamil, he will be singled out and persecuted as a terrorist or suspected terrorist.

 Petitioner complains to this court that the BIA did not consider his claim of persecution on the basis of membership in a particular social group. This is true, but is attributable to the fact that petitioner failed to raise this claim before the BIA. Petitioner's brief to the BIA stated only the following issues for its consideration:

A. Whether the Appellant established that he had a well-founded fear of persecution *on account of his political opinion,* so as to be eligible for asylum pursuant to Section 208(a) of the INA, 8 U.S.C. § 1158(a).

B. Whether the Appellant established a clear probability of persecution *on account of political opinion* so as to be eligible for withholding of deportation pursuant to Section 243(h) of the INA, 8 U.S.C. § 1253(h).

C. Whether the Immigration Judge erred in failing to find Appellant's testimony to be credible.

---

4. Furthermore, the Board had reason to doubt the genuineness of petitioner's fear, given that he remained in Sri Lanka so long after the alleged incidents of persecution against him. He decided to seek asylum and not to return to Sri Lanka only after many months at sea. He did not seek asylum when he went ashore in Puerto Rico. He lived and worked in Boston for six months without informing U.S. officials of his desire for asylum. He applied for asylum only after he faced deportation. When asked at the hearings before the Immigration Judge why he chose to stay in the United States, petitioner replied, "This country is the place. It's a good country and also [has] opportunities to study and to get ahead in life."

D. Whether Appellant's case should be remanded for consideration by the Immigration Judge pursuant to revised regulations promulgated by the Attorney General.

Brief for Respondent, Appeal of the Decision of the Immigration Judge to the Board of Immigration Appeals, at 1 (emphasis added). Except for two unexplained references to "persons similarly situated," nowhere in the brief did petitioner mention or allude to membership in a particular social group as grounds for his fear of persecution. Read in the light most favorable to petitioner, the record does not indicate that petitioner raised the issue of social group persecution before the Board.

Issues not raised before the Board may not be raised for the first time upon judicial review of the Board's decisions. Petitioner is required to have exhausted his administrative remedies before seeking judicial ones. *See* 8 U.S.C. § 1105a(c) (1970) ("An order of deportation or of exclusion shall not be reviewed by any court if the alien has not exhausted the administrative remedies available to him as of right ..."); *Khalaf,* 909 F.2d at 592; *Alvarez–Flores,* 909 F.2d at 8. The exhaustion requirement is jurisdictional. *See Atehortua–Vanegas v. I.N.S.,* 876 F.2d 238, 240 (1st Cir.1989); *Vargas v. United States Dept. of Immigration & Naturalization,* 831 F.2d 906, 907–08 (9th Cir.1987); *Tejeda–Mata v. I.N.S.,* 626 F.2d 721, 726 (9th Cir.1980), *cert. denied,* 456 U.S. 994, 102 S.Ct. 2280, 73 L.Ed.2d 1291 (1982). Because he could have, but did not, raise this issue below, petitioner failed to exhaust his administrative remedies and thus waived his right to be heard on the claim of persecution on account of membership in a particular social group.[5]

**5.** Even if we had jurisdiction to consider this claim, it seems unlikely that petitioner could have succeeded. We question whether all Tamil males between fifteen and forty-five constitutes a "particular social group" under Section 101(a)(42)(A) of the Act. In analyzing a similar claim, the Ninth Circuit Court of Appeals wrote that:

> The statutory words "particular" and "social" which modify "group," 8 U.S.C. §§ 1101(a)(42)(A), 1253(h), indicate that the term does not encompass every broadly defined segment of a population, even if a certain demographic division does have some statistical relevance. Instead, the phrase *"particular social* group" implies a collection of people closely affiliated with each other, who are actuated by some common impulse or interest. Of central concern is the existence of a voluntary associational relationship among the purported members, which imparts some common characteristic that is fundamental to their identity as a member of that discrete social group.
>
> Perhaps a prototypical example of a "particular social group" would consist of the immediate members of a certain family, the family being a focus of fundamental affiliational concerns and common interests for most people.... As a contrasting example, a statistical group of males taller than six feet would not constitute a "particular social group" under any reasonable construction of the statutory term, even if individuals with such characteristics could be shown to be at greater risk of persecution than the general population.

*Sanchez–Trujillo v. I.N.S.,* 801 F.2d 1571, 1576 (9th Cir.1986) (citations omitted) (emphasis in original). The court in *Sanchez–Trujillo* went on to hold that the class of young, working class, urban males of military age in El Salvador does not constitute a "particular social group" within the meaning of Section 101(a)(42)(A):

> Major segments of the population of an embattled nation, even though undoubtedly at some risk from general political violence, will rarely, if ever, constitute a distinct "social group" for the purposes of establishing refugee status. To hold otherwise would be tantamount to extending refugee status to every alien displaced by general conditions of unrest or violence in his or her home country. *Id.* at 1577.

Even, moreover, if male Tamils between fifteen and forty-five constituted "a particular social group" under Section 101(a)(42)(A) of the Act, a reasonable fact finder could conclude that petitioner failed to show he had a well-founded fear of persecution simply *because of* his inclusion within that group. To support his claim, petitioner points to the trouble he personally had encountered with authorities and the government's repression of Tamils of all ages and genders. However, the alleged persecution of petitioner was not shown to be due to his status as a male older than fifteen and younger than forty-five; it is unclear to what degree gender and age were key factors linked to his persecution. That suspected militants and militant supporters may also often happen to be young Tamil men does not show that young Tamil men, *as a group,* are persecuted. *See id.* at 1577. "Instead, the evidence indicates that the risk of persecution relates principally to the existence of actual or imputed political opinion." *Id.*

Petitioner argues that our decision in *Ananeh–Firempong v. I.N.S.,* 766 F.2d 621 (1st Cir.

### B. *Withholding of Deportation*

 A second issue raised by petitioner is whether the BIA's denial of withholding of deportation was supported by substantial evidence. To be entitled to withholding of deportation pursuant to section 243(h) of the Act, petitioner must show a "clear probability of persecution" in the country designated for deportation, on account of his race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1253(h). An alien must demonstrate that "it is more likely than not that the alien would be subject to persecution" to be entitled to withholding of deportation. *I.N.S. v. Stevic*, 467 U.S. 407, 424, 104 S.Ct. 2489, 2498, 81 L.Ed.2d 321 (1984). The "more likely than not" standard is higher and more difficult to meet than the well-founded fear requirement for asylum. *Cardoza-Fonseca*, 480 U.S. at 424, 449, 107 S.Ct. at 1209, 1222. In this case, since the BIA's determination that petitioner does not have a well-founded fear of persecution is supported by substantial evidence, it follows that he also fails to meet the higher standard for withholding of deportation. *See Khalaf*, 909 F.2d at 590 n. 1.

### C. *Due Process*

 The petitioner's final argument is that he was denied due process at the hearings before the Immigration Judge. He asserts that his testimony was inadequately translated, certain questions should not have been ruled to be leading, and the Immigration Judge made improper assumptions and statements regarding the evidence.[6]

Petitioner did not, however, raise these complaints before the BIA. As already discussed, we have no jurisdiction to hear issues not raised before the Board. To be sure, claims of a denial of due process may be exempt from this procedural rule where they are of the kind the BIA could not adjudicate because of their predominantly constitutional character. The BIA is without jurisdiction to adjudicate purely constitutional issues. *Vargas*, 831 F.2d at 908; *Bagues-Valles v. I.N.S.*, 779 F.2d 483, 484 (9th Cir.1985). But,

> a petitioner cannot obtain review of procedural errors in the administrative process that were not raised before the agency merely by alleging that every such error violates due process. "Due process" is not a talismanic term which guarantees review in this court of procedural errors correctable by the administrative tribunal.

*Reid v. Engen*, 765 F.2d 1457, 1461 (9th Cir.1985). Unless an alien shows that his unraised due process claims go beyond mere "procedural errors," which the BIA plainly may address, *infra*, this court lacks jurisdiction to hear them. *See Vargas*, 831 F.2d at 908; *see also El Rescate Legal Services, Inc. v. Executive Office of Immigration Review*, 941 F.2d 950, 953 (9th Cir.1991) (distinguishing jurisdiction to rule on the merits of an individual deportation order and jurisdiction to rule on an alleged

1985), which permitted an alien from Ghana to reopen her deportation hearings because of alleged persecution against members of particular social groups, compels the same decision in this case. That case is significantly different from this one, however. In *Ananeh-Firempong*, the petitioner was a member of three small, distinct social groups, including the group of former government party officials who were ousted from power. *Ananeh-Firempong*, 766 F.2d at 623. Petitioner there provided extensive evidence of killings and explicit death threats against these groups. She also alleged that her family had been severely beaten, placed under house arrest, and had their bank accounts seized. *Id.* at 623. In *Ananeh-Firempong*, we decided only that the petitioner had made out a prima facie case for withholding of deportation

and should have the opportunity to prove the alleged facts in a hearing. *Id.* at 622. Here, our review is restricted to whether petitioner's case was "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *Elias-Zacarias*, —— U.S. at ——, 112 S.Ct. at 817.

**6.** Petitioner also contends, as he did before the BIA, that the Immigration Judge should not have excluded as hearsay the written statement of a witness who was familiar with the NVDAG. The BIA agreed with petitioner and considered the excluded statement in its decision. We, too, have considered the statement in our review of the BIA's findings. Hence, assuming the Immigration Judge erred, this error was immaterial.

pattern and practice of constitutional or statutory violations).

Here, petitioner is not challenging the constitutionality of the statutes, regulations or formal procedures which governed his hearing. Instead, he complains of defects of translation, evidentiary rulings and judicial conduct in his individual hearing, irregularities which the BIA could have corrected if brought to its attention. The Board has the power to remand a case to the Immigration Judge to remedy deficiencies in proof or procedure. *See Tandaric v. Robinson*, 257 F.2d 895, 899 (7th Cir. 1958), *cert. denied*, 358 U.S. 931, 79 S.Ct. 318, 3 L.Ed.2d 303 (1959); *see also* 8 C.F.R. § 3.1(d)(2) ("The Board may return a case to the Service or Immigration Judge for such further action as may be appropriate ...."). Having failed to exhaust his administrative remedies, petitioner has deprived this court of jurisdiction to hear this issue.

## III. CONCLUSION

In conclusion, we find substantial evidence to support the Board of Immigration Appeals' determination that petitioner does not qualify for asylum under Section 208(a) of Immigration and Naturalization Act, 8 U.S.C. § 1158(a), and is not entitled to withholding of deportation under Section 243(h), 8 U.S.C. § 1253(h). Since the Government did not oppose petitioner's request to depart voluntarily, as the Board previously authorized, we direct the I.N.S. to treat the 30–day voluntary departure period as beginning to run on the date this court's mandate becomes effective. *See Umanzor–Alvarado v. I.N.S.*, 896 F.2d 14, 16 (1st Cir.1990); *Novoa–Umania*, 896 F.2d at 5.

*The petition for review is denied. No costs.*