USCA1 Opinion

 

 May 6, 1994 [NOT FOR PUBLICATION] UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT ____________________ No. 93-2135 SANMUGANATHAN NAKESWARAN, Petitioner, v. IMMIGRATION AND NATURALIZATION SERVICE, Respondent. ____________________ PETITION FOR REVIEW OF AN ORDER OF THE BOARD OF IMMIGRATION APPEALS ____________________ Before Selya, Circuit Judge, _____________ Bownes, Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________ ____________________ Visuvanathan Rudrakumaran, with whom the Law Offices of Boris J. _________________________ _________________________ Lewcyckyj was on brief for petitioner. _________ Ellen Sue Shapiro, Attorney, Office of Immigration Litigation, ___________________ Civil Division, United States Department of Justice, with whom Frank _____ W. Hunger, Assistant Attorney General, and Richard M. Evans, Assistant _________ ________________ Director, were on brief for respondent. ____________________ ____________________ BOWNES, Senior Circuit Judge. In this case, BOWNES, Senior Circuit Judge. ______________________ Sanmuganathan Nakeswaran, a citizen of Sri Lanka, petitions for review of a final order of the Board of Immigration Appeals (BIA or Board) denying his request for asylum and ordering him deported to Sri Lanka. We have jurisdiction over petitioner's appeal under Section 106(a) of the Immigration and Nationality Act, 8 U.S.C. 1105a(a). We affirm the decision and deportation order of the Board. Petitioner raises three issues on appeal: (1) that he is entitled to temporary refugee status under the Fourth Geneva Convention; (2) that the Board's practice of giving "precedential value" to Matter of T, Int. Dec. 3187 (BIA ____________ 1992) is an error of law; and (3) that he has a well-founded fear of persecution in Sri Lanka on account of political opinion, imputed political opinion and social group membership. We address the issues seriatim. The first two are clearly questions of law. WHETHER THE FOURTH GENEVA WHETHER THE FOURTH GENEVA _________________________ CONVENTION ENTITLES PETITIONER CONVENTION ENTITLES PETITIONER ______________________________ TO TEMPORARY REFUGEE STATUS. TO TEMPORARY REFUGEE STATUS. ____________________________ A line of cases has firmly established that only in the absence of a treaty or a controlling executive decision, legislative act, or judicial decision do international law principles come into play in respect to the admission or exclusion of aliens. In The Chinese Exclusion Case, 130 U.S. __________________________ 581 (1889), the Court upheld the right of Congress to exclude -2- 2 Chinese laborers from the United States even if the Congressional Act conflicted with treaties between the United States and China. In Fong Yue Ting v. United States, 149 ______________ ______________ U.S. 698 (1893), the Court stated: The power to exclude or to expel aliens, being a power affecting international relations, is vested in the political departments of the government, and is to be regulated by treaty or by act of Congress, and to be executed by the executive authority according to the regulations so established, except so far as the judicial department has been authorized by treaty or by statute, or is required by the paramount law of the Constitution, to intervene. Id. at 713. ___ In The Paquette Habana, 175 U.S. 677 (1900), the ____________________ Court discussed specifically when international law could be used by the courts: International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination. For this purpose, where there is no treaty, and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations . . . . Id. at 700. ___ In Galvan v. Press, 347 U.S. 522, 530 (1954), the ______ _____ Court noted: The power of Congress over the admission of aliens and their right to remain is necessarily very broad, -3- 3 touching as it does basic aspects of national sovereignty, more particularly our foreign relations and the national security. In Kleindienst v. Mandel, 408 U.S. 753 (1972), the ___________ ______ Court declined to reconsider this line of cases. Id. at 767. ___ Relying on Galvan v. Press it noted: ______ _____ In summary, plenary congressional power to make policies and rules for exclusion of aliens has long been firmly established. Id. at 769-70. ___ Id. at 769-70. ___ Admirable as the provisions of the Fourth Geneva Convention may be, it is clear that they do not apply to this case. It is the immigration laws of the United States and the case law interpreting them that control. WHETHER THE BOARD'S PRACTICE WHETHER THE BOARD'S PRACTICE _____________________________ OF GIVING PRECEDENTIAL VALUE TO OF GIVING PRECEDENTIAL VALUE TO ________________________________ THE MATTER OF T IS LEGAL ERROR. THE MATTER OF T IS LEGAL ERROR. _______________________________ Petitioner objects to the use of the case, Matter ______ of T, by the Board because "it concluded that Tamils are not ____ persecuted in Sri Lanka." This is a very broad and basically inaccurate statement of the Board's conclusions which followed a detailed recitation of the violence that has taken place in Sri Lanka among various ethnic groups. The Board concluded, inter alia: _____ ____ This Board in turn appreciates the awful circumstances in which the Sri Lankan Government and large numbers of the inhabitants of that country find -4- 4 themselves. But if we were to accept the applicant's assessment of human rights violations as constituting persecution under the Act, Tamils, Moslems, and Sinhalese alike would all be persecuted in Sri Lanka. Neither the relief of asylum nor of withholding of deportation provides for refuge "on account of" human rights abuses unconnected to the grounds enumerated in the Act, i.e., race, religion, nationality, membership in a particular social group, or political opinion. See sections 208(a), 243(h)(1) ___ of the Act; section 101(a)(42) of the Act, 8 U.S.C. 1101(a)(42) (1988). We will not, however, discuss the merits of the Matter of T. We are not reviewing that case, nor do we rely ___________ directly or indirectly on its conclusions or statement of facts. Suffice it to say that the Board of Immigration Appeals, as with any other agency that renders a written opinion after a hearing, has a right to rely on its own decisions as precedent until that decision is overruled by the Board, one of the Courts of Appeals, or the United States Supreme Court. WHETHER PETITIONER HAS A WELL- WHETHER PETITIONER HAS A WELL- ______________________________ FOUNDED FEAR OF PERSECUTION ON ACCOUNT FOUNDED FEAR OF PERSECUTION ON ACCOUNT ______________________________________ OF POLITICAL OPINION, IMPUTED POLITICAL OF POLITICAL OPINION, IMPUTED POLITICAL ________________________________________ OPINION, OR SOCIAL GROUP MEMBERSHIP. OPINION, OR SOCIAL GROUP MEMBERSHIP. ____________________________________ This issue requires us to read the record so as to determine whether there is substantial evidence to support the Board's decision. Ravindran v. I.N.S., 976 F.2d 754, 758 _________ ______ (1st Cir. 1992). The Board did not assess the credibility findings of the Immigration Law Judge "because even if we accept all of the respondent's testimony as true, he has not -5- 5 satisfied the well-founded fear standard of eligibility under the Act." A) Summary of the Record A) Summary of the Record The testimony at the hearing was primarily by petitioner. Petitioner is an alien from Sri Lanka. He was permitted to enter the United States in 1983 as an alien in transit. He has been in this country since that time. His visa expired on November 30, 1985. In his asylum application petitioner admitted that he had stayed in the United States longer than permitted under the Immigration and Nationality Act and conceded that he was deportable. His asylum application states that he has never been detained, interrogated, convicted or sentenced in any country or mistreated by Sri Lanka authorities. Petitioner's wife and two children were permitted to come to the United States in 1984 so that his oldest son could receive medical treatment. A third son was born after his wife entered the United States. Petitioner's wife and children now reside in Canada as refugees. Petitioner testified that he did not accompany his family to Canada because he cannot learn another language, is getting old, and is under medical treatment in the United States. Petitioner is a Tamil, a minority ethnic group in Sri Lanka. He was born a Hindu, but later became a Christian -6- 6 because he "had problems with the Sinhalese as a Hindu." The Sinhalese are the largest ethnic group in Sri Lanka. Petitioner worked in Saudi Arabia under a five-year contract starting February 6, 1978. He returned to Sri Lanka for a one-month vacation each year. In 1977 petitioner was attacked by a group of Sinhalese while on a train travelling from Jaffna to Colombo. This happened again in 1980. After being attacked in 1980, petitioner ran away before the police and army could attack him. In March of 1981 he reported an incident to the police. Although petitioner did not describe the incident, we will assume that it was another Sinhalese attack on him. According to petitioner, the police told him: Being a Tamil you should not have even come here. We are not going to listen to your statements. We even know that one of your brothers is involved in creating troubles, and you have come here to join your brother to help your brother, therefore it is better for you to run away from here, otherwise we will murder you. Petitioner replied to the police they were lying about his brother, that his brother was a student and worked for organizations that looked after the needs of the Tamil people, and that his brother was a scout for the Tamil student organization. Petitioner testified that, to his knowledge, his brother did not belong to any Tamil political organizations. He explained that, as a scout, his brother helps Tamil -7- 7 refugees who had been driven from their homes during communal riots and came to Jaffna by ship. The name of this brother is Ganeswaran. During one of his visits home from Saudi Arabia, his parents told him that Ganeswaran had been accused of taking part in political activities against the government and had been jailed for three months. Friends told him that they also had been imprisoned for three months, and that during the arrest of his brother, the police had dislocated Ganeswaran's hand. In July of 1983, petitioner flew to Sri Lanka from Saudi Arabia. He had trouble leaving the airport because of people openly hostile to Tamils. He was told by the police that he could leave the airport if he wished, but they were not prepared to give him any protection. According to petitioner, "[t]he Army people were shouting: 'let the Tamils out, let the Tamils out. We will kill them.'" As a result, petitioner was forced to stay in the airport "from 8:00 a.m. on Saturday until 5:00 the following Sunday." He managed to get out of the airport with the help of his roommate who was a Muslim. His roommate gave petitioner a cap to wear signifying that he was a Muslim and he used the name of his roommate's brother-in-law, Farook. He and his roommate took a taxi to his roommate's house where he stayed for about fifteen days. -8- 8 Petitioner, still disguised as a Muslim, then went to his parent's home where his wife lived. He only stayed there for four or five hours because his father advised him to leave and go to his mother-in-law's house. The reason for this advice was that the Army and other people came to the home of petitioner's parents frequently looking for his brother, Ganeswaran. By this time Ganeswaran had gone to India. He was, at the time of the hearing, living in Germany. After petitioner and his wife had gone to his mother-in-law's home, the police visited his parents' home. Noting that petitioner's wife was not there, the police found out from petitioner's father where she had gone. Petitioner's father promptly told petitioner that the police might go to his mother-in-law's home and advised him to leave. By the time the police arrived at petitioner's mother-in-law's home, he had gone to Colombo "to save my life." Petitioner decided to go to India. He renewed his passport in 1983 by paying a broker 1000 rupees to go to the passport office for him. Petitioner did this because the police were looking for him and the people in the passport office were Sinhalese and "they wouldn't do it for me." Petitioner also testified, however, that he had no problem getting his passport stamped each time he came back to Sri -9- 9 Lanka from Saudi Arabia and returned to continue working in Saudi Arabia. Petitioner attributed this to the fact that those working in Saudi Arabia had no passport problems. Petitioner was told by his wife that the Army had come looking for him while she was living with her parents. She also told him that the Army had shot her uncle. Another brother of petitioner, Rajeswaran, was arrested by security personnel on his return to Saudi Arabia from Sri Lanka. The reason for the arrest was that it was suspected that Rajeswaran was sending money from Saudi Arabia to the Tamil Tigers. The Tamil Tigers is an organization that uses violence to try to achieve its goal of a separate Tamil state. On June 3, 1987, petitioner, who was in the United States, was informed by telephone that his brother Rajeswaran had been arrested on June 2 at the airport on his way back to Saudi Arabia. Petitioner made arrangements to raise the 50,000 rupees necessary to bail his brother out of jail. Petitioner also called the company his brother worked for in Saudi Arabia to ensure that his brother could return to his job. Petitioner talked to his brother on the phone before his return to Saudi Arabia. His brother told petitioner that he ached all over and was "really suffering." He advised petitioner never to come back to Sri Lanka. At the end of July petitioner's brother called him from Saudi Arabia. He -10- 10 told petitioner that "the Ceylon Army and Police had kicked him, used the bayonet, and put his face in a chili bag." A chili bag contains "chilies" that burn a person's face. After petitioner's brother, Rajeswaran, went back to Saudi Arabia to work, police came to the house looking for him. His family abandoned their house and moved about twelve miles away. The house was partly destroyed by a shell that hit the house during a battle between government forces and Tamil guerrillas. Petitioner testified, "I feel it was for us." In late 1983 petitioner decided not to go to India as he had intended, but to come to the United States. His change of mind was based on a job offer on a ship that was supposedly berthed in Wilmington. Petitioner flew to New York City, arriving there on November 27, 1983. He has been in the United States since that date. The job never materialized so petitioner came to Boston, where he has relatives. About a week after he arrived in the United States, petitioner joined the Tamil Eelam Association, which "is fighting for freedom and some form of consolation [sic] for the Tamils to live in our country." As a member of Tamil Eelam, petitioner has participated in three marches held in Washington and three other marches held in Cambridge, Boston, and New York City. Videotapes were made of the -11- 11 demonstrations and pictures taken of the participants by members of the Sri Lankan Embassy. Petitioner testified that after joining the Tamil Eelam and participating in their marches, he is afraid to go back to Sri Lanka. He thinks that he might be shot and said that, "a man who is a mechanic who studied with me was shot, for no reason, and this can happen to me, too." Petitioner's fear of returning to Sri Lanka is based on his Tamil Eelam activities in the United States. He was not involved in politics in Sri Lanka. Petitioner is aware of an agreement between Sri Lanka and India under the terms of which persons in detention would be released, the police and army would be relieved of their duties in the north and east of Sri Lanka and general elections would be held there. Petitioner did not think that the agreement was favorable to the Tamils, despite the fact that it was supported by Tamil Eelam. Petitioner acknowledged that the terrorist organization known as the Tamil Tigers is opposed to the peace agreement. Petitioner denied that he would fight with the Tigers, but stated that he agreed with their goal of a separate government for the Tamils. It is petitioner's opinion that unless the Tamils have a country of their own they will never be safe in Sri Lanka. The Sixth Amendment to the Constitution of Sri Lanka -12- 12 prohibits any form of support for an independent Tamil state anywhere. At the time the petitioner's hearing came to a close, his parents, four sisters, and another brother, Ratnaeswaran, were living in Sri Lanka. B) The Applicable Law B) The Applicable Law __________________ 8 U.S.C. 1158(a) provides: The Attorney General shall establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title. The pertinent part of section 1101(a)(42)(A) states: The term "refugee" means (A) any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well- founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. We note that in this case there is no claim of persecution of petitioner while he was living in Sri Lanka. His asylum application states that he was never mistreated by Sri Lankan authorities. The only question is whether petitioner has a well-founded fear of persecution if he is returned to Sri Lanka. Petitioner has the burden of proof. -13- 13 Ravindran, 976 F.2d at 758; Alvarez-Flores v. I.N.S., 909 _________ ______________ ______ F.2d l, 3 (1st Cir. 1990). There are subjective and objective components to the well-founded fear standard. The subjective component requires that the asserted fear be genuine. The objective component, on the other hand, contemplates that the applicant show "'by credible, direct, and specific evidence, ... facts that would support a reasonable fear that the petitioner faces persecution.'" Alvarez-Flores, 909 F.2d ______________ at 5 (quoting _______ -14- 14 Diaz-Escobar v. I.N.S., 782 F.2d 1488, ____________ ______ 1492 (9th Cir. 1986)). Ravindran, 976 F.2d at 758. _________ A person seeking asylum does not have to prove "that it is more likely than not that he or she will be persecuted in his or her home country." I.N.S. v. Cardoza- ______ ________ Fonesca, 480 U.S. 421, 449 (1987). An alien, such as _______ petitioner, seeking asylum need only prove that his fear is genuine and reasonable. Khalaf v. I.N.S., 909 F.2d 589, 591 ______ ______ (1st Cir. 1990). This lessened burden has been, however, offset somewhat by the Court's recent heightening of the deference due the Board's decision. In order to obtain judicial reversal of the Board's determination, petitioner must show that the evidence he presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution. I.N.S. v. Elias-Zacarias, ____ U.S. ____, ____, 112 S. Ct. ______ ______________ 812, 817 (1992). CONCLUSION CONCLUSION __________ We find substantial evidence in the record to support the Board's conclusion that petitioner failed to prove the objective component of the standard: "that there was not a well-founded fear of persecution by the Sri Lankan authorities on any of the five grounds specified in the Act." Because there is no question that Tamils, as well as other ethnic groups in Sri Lanka, have suffered onslaughts of -15- 15 violence engendered by ethnicity we turn to the case law for guidance. We have held that acts of violence against a petitioner's friends or family members may establish a well-founded fear, notwithstanding an utter lack of persecution against the petitioner herself. We have required, however, that this violence create a pattern of persecution closely tied to the petitioner. Allegations of isolated violence are not enough. Arriaga-Barrientos v. I.N.S., 937 F.2d 411, 414 (9th Cir. __________________ ______ 1991) (citations omitted). The authorities were interested in petitioner's brother, Ganeswaran, not petitioner, and it was Ganeswaran who was assaulted and arrested by the police. Petitioner was in the United States when his brother Rajeswaran was arrested and beaten. We think it significant that petitioner was able, by telephone, to obtain the release of his brother from jail and arrange for Rajeswaran to go back to work in Saudi Arabia. We cannot ignore the fact that petitioner's parents, four sisters, and a brother continue to live in Sri Lanka. As we pointed out in Ravindran, 976 F.2d at 759: _________ "Generally, evidence of widespread violence and human rights violations affecting all citizens is insufficient to establish persecution." Ravindran is a case practically on _________ all fours with this one. It involved a Tamil petitioner claiming a well-founded fear of persecution if he were deported. The decision in Ravindran is, therefore, binding _________ -16- 16 on us. Petitioner does not refer to Ravindran at all in his _________ brief. There is no evidence that the political opinions, goals and methods of the Tamil Tigers have been imputed to the petitioner by the Sri Lankan authorities. Nor is there evidence that the Sri Lankan authorities know of petitioner's membership in the Tamil Eelam Association. But even assuming that they do know, there is no evidence that membership on the Tamil Eelam would result in persecution. The Tamil Eelam supports the peace pact between Sri Lanka and India. Nor is there any evidence that petitioner's advocacy of an independent Tamil state will result in his persecution because it may have violated the Sixth Amendment to the Constitution of Sri Lanka. Petitioner's advocacy of an independent Tamil state took place in the United States. There is no evidence that the authorities in Sri Lanka are aware of petitioner's views. There is nothing in the record suggesting that Sri Lankan authorities have persecuted Tamils for opinions expressed in another country. There is in the record a letter from the State Department to the Immigration Examiner containing a copy of the January 1984 State Department Report on Human Rights Practices in Sri Lanka for the calendar year 1983 which gives a different perspective on the situation in Sri Lanka. A portion of the report states: -17- 17 In general, and as explained in greater detail in the enclosed human rights report, there is distrust and animosity between Tamils and the majority Sinhalese of Sri Lanka. Communal tensions led in mid-1983 to the worst outbreak of violence and lawlessness to have occurred in Sri Lanka in recent history. In a week of rioting, several hundred people were killed and thousands lost their homes. The Government restored order in early August and has succeeded in maintaining the peace since then, but tensions remain. Many of the Tamils affected by the violence suffered great personal and property losses, and some fear there will be a recurrence of violence. But any threat against the peace and well-being of Tamils, and of all Sri Lankans, arises from tensions in society, and not from a policy of the Government to persecute or to allow the persecution of Tamils or any other group. The leaders of the Government, who include Tamils, strive to protect all Sri Lankans. Illegal discrimination against Tamils does not occur with the sanction of the Government. Whether petitioner will suffer violence on his return to Sri Lanka, we do not know. We do know, however, that there is no principled basis for overturning the Board's decision. Affirmed. Affirmed. _________ -18- 18