<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                  United States Court of Appeals
                       For the First Circuit
                       ____________________
                                  
                                  
No. 97-1836

                      LUCIENNE YVETTE CIVIL,
                                  
                            Petitioner,
                                  
                                v.
                                  
              IMMIGRATION AND NATURALIZATION SERVICE,
                                  
                            Respondent.
                                  
                       ____________________
                                  
               ON PETITION FOR REVIEW OF AN ORDER OF
                 THE BOARD OF IMMIGRATION APPEALS
                                  
                       ____________________
                                  
                              Before
                                  
                      Torruella, Chief Judge,
                   Bownes, Senior Circuit Judge,
                     and Stahl, Circuit Judge.
                                  
                       ____________________
                                  
   Eleanor J. Newhoff with whom Harvard Immigration and Refugee
Clinic of Greater Boston Legal Services was on brief for appellant.
   Terri J. Lavi, Attorney, with whom Frank W. Hunger, Assistant
Attorney General, and Karen Fletcher Torstenson, Assistant Director,
were on brief for appellee.

                        ____________________
                           May 15, 1998

                        ____________________

     STAHL, Circuit Judge.  Appellant Lucienne Yvette
   Civil appeals a Board of Immigration Appeals ("Board" or "BIA")
   decision affirming an Immigration Judge's denial of her
   application for political asylum.  Adopting the factual
   findings of the Immigration Judge ("IJ"), the Board found that
   petitioner did not have a well-founded fear of persecution.  
   Because we find that substantial evidence supports the Board's
   conclusion, we affirm.
                                 I.
                    FACTS AND PRIOR PROCEEDINGS
       Petitioner Lucienne Yvette Civil sought political
   asylum under section 208(a) of the Immigration and Nationality
   Act ("INA"), 8 U.S.C.  1158(a), on the basis that she had a
   well-founded fear that she would be persecuted for her
   political beliefs if she returned to Haiti.   
       Civil's asylum application, affidavit, and testimony
   stated the following.  Born on July 12, 1976, in Croix-des-
   Missions, Haiti, Civil lived with her parents until the mid-
   1980s, when they emigrated to the United States.  After her
   parents left Haiti, Civil lived with her grandmother, brother,
   aunt, and three cousins.  She was fourteen years old when Jean-
   Bertrand Aristide was elected president of Haiti.  Following
   Aristide's inauguration, Civil and members of her family
   celebrated with others in the streets, and her grandmother
   displayed a quilt that had an emblem on it outside of their
   house to show the family's support for Aristide.  Subsequently,
   Civil graduated from a private Catholic school in 1991, and
   planned to attend Franco-Haitian University in Port-au-Prince.  
   Because of demonstrations following the coup d'etat that forced
   Aristide from office in September 1991, the university's
   opening was delayed.  Throughout this period, Civil did not
   participate in any political campaigns or marches in support of
   Aristide.  In January 1992, she began attending classes at the
   university.  She testified that she and other students were
   fearful because violent crime was rampant and because they had
   heard that the Ton Ton Macoutes, a paramilitary organization,
   were entering schools and kidnapping students.  Civil also
   testified that a woman in her neighborhood and a fellow student
   -- both Aristide supporters -- had been raped by members of the
   Macoutes.   
       Petitioner's decision to flee Haiti was prompted by
   an incident that led her to believe that she was being
   persecuted because of her pro-Aristide views.  In December
   1992, as she and six friends were standing outside her home
   discussing President Aristide and expressing their desire to
   see him restored to power, a man who apparently had overheard
   their conversation told them that "Children shouldn't be
   talking about such things.  There are a lot of people who don't
   like Aristide and they can kill you.  Aristide can't do
   anything for you now."  Civil recognized that the man, who
   appeared to be in his twenties, was one of the regular
   customers at her grandmother's bread and coffee store, which
   was located in the front of their home.  Civil and her friends
   suspected that the man was a Macoute because he was wearing the
   type of boots that Macoutes purportedly wore, and because he
   warned them about expressing their views on Aristide.  That
   same night, petitioner and her family were awakened by persons
   banging on the door and demanding entrance to the house.  
   Although the persons did not identify themselves or mention
   Aristide, Civil and her family believed that they were
   Macoutes, reasoning that thieves would not bother knocking.  
   The family remained flat on the floor for about two hours,
   during which time their house was stoned.  The next morning,
   they discovered that the family's pet dog had been stoned to
   death.   
       Fearing that the Macoutes would return, Civil and her
   brother left their home to stay with a friend of their
   grandmother in Carrefour Clercine.  Civil remained afraid,
   however, because the Macoutes were "making their way" to the
   part of the village where she was staying, and she thought that
   they might recognize her.
       On January 17, 1993, fearing for her safety, Civil
   left Haiti and came to the United States unlawfully.  Although
 democratic government was restored to Haiti in September 1994,   
   Civil continues to fear returning to Haiti because, she
   asserts, Haiti remains unstable, and anti-Aristide factions
   continue to persecute Aristide supporters.   
      After arriving in the United States, Civil was
   detained and placed in exclusion proceedings.  She requested
   political asylum under section 208(a) of the INA, 8 U.S.C.  
   1158(a), and withholding of deportation under section 243(h) of
   the INA, 8 U.S.C.  1253(h).  On February 21, 1995, an
   Immigration Judge ("IJ") found her excludable under section
   212(a)(6)(C)(i) of the INA, 8 U.S.C.  1182(a)(6)(C)(i), for
   attempting to procure entry into the United States by fraud or
   willful misrepresentation, and rejected her requests for asylum
   and withholding of deportation on the basis that petitioner had
   failed to demonstrate that she has a well-founded fear of
   persecution.  On June 26, 1997, a three-member panel of the BIA
   rejected Civil's appeal from the IJ's finding of excludability
   and denial of asylum.  Civil now appeals the Board's decision
     on her asylum claim.

                              II.
                             DISCUSSION
   A.  Standard of Review
      "The Board's determination of statutory eligibility
   for relief from deportation is conclusive if 'supported by
   reasonable, substantial, and probative evidence on the record
   considered as a whole.'"  Gebremichael v. INS, 10 F.3d 28, 34
   (1st Cir. 1993) (quoting INS v. Elias-Zacarias, 502 U.S. 478,
   482 (1992)); 8 U.S.C.  1105a(a)(4).  Reversal of the Board's
   determination thus depends on whether the petitioner has shown
   "that the evidence he presented was so compelling that no
   reasonable factfinder could fail to find [that he was
   eligible]."  Elias-Zacarias, 502 U.S. at 484.  We review
   questions of law de novo.
   B.  Analysis       
      Petitioner argues that she established eligibility
   for political asylum by presenting to the IJ consistent,
   detailed, and credible testimonial and documentary evidence
   which confirmed that her fears of persecution are well-founded.  
   In addition, she argues that the BIA deprived her of due
   process by taking administrative notice of changes in Haiti's
   social and political conditions since she fled Haiti.  
      An applicant for political asylum bears the burden of
   showing that he or she has been persecuted, or has a well-
   founded fear of future persecution, on account of race,
   religion, nationality, membership in a particular social group,
 or political opinion.    See 8 C.F.R.  208.13(b).  In order to
   establish a well-founded fear of future persecution, a
   petitioner must have shown both a genuine subjective fear and
   an objectively reasonable fear of persecution on a protected
   ground.  See, e.g., Ravindran v. INS, 976 F.2d 754, 758 (1st
   Cir. 1992); Alvarez-Flores v. INS, 909 F.2d 1, 5 (1st Cir.
   1990).  The objective component requires a showing "by
   credible, direct, and specific evidence . . . facts that would
   support a reasonable fear that the petitioner faces
   persecution."  Ravindran, 976 F.2d at 758 (internal citations
   omitted).  An applicant need not establish that he or she would
   be singled out individually for persecution if the applicant
   establishes that "there is a pattern or practice in his or her
   country of nationality . . . of persecution of persons
   similarly situated to the applicant," and if the applicant
   "establishes his or her own inclusion in and identification
   with such group of persons such that his or her fear of
   persecution upon return is reasonable." 8 C.F.R.  
   208.13(b)(2); see, e.g., Gebremichael, 10 F.3d at 35 (holding
   that an applicant may establish asylum eligibility "if
   membership in a social group is at the root of persecution,
   such that membership itself generates a specific threat to the
   applicant") (internal quotation omitted).
       Although the Board devoted the bulk of its analysis
   of Civil's asylum application to reciting virtually verbatim a
   discussion of changed country conditions set forth in an
   earlier opinion, In Re E-P-, No. 3311 (BIA, Mar. 14, 1997), it
   also expressly adopted that part of the IJ's opinion that held
   that Civil had failed to meet her burden of proving a well-
   founded fear of persecution on account of her political
   opinion.  In his decision, the IJ placed weight on the fact
   that Civil had participated in no demonstrations or any outward
   manifestations of her support for Aristide.  He also opined
   that the fact that petitioner's house was stoned on the same
   day that a man who was alleged to be a member of the Ton Ton
   Macoutes overheard petitioner and her friends discussing their
   support for Aristide did not constitute evidence that
   petitioner had been targeted because of her political beliefs.  
   The IJ further observed that, according to the State
   Department, although eavesdropping by the Ton Ton Macoutes,
   uniformed military, or "plainclothes stool pigeons" could
   happen, and is sometimes alleged by Haitian asylum applicants,
   retribution on the basis of such incidents is "less certain."  
   He emphasized, in addition, that the State Department had
   reported that, frequently, attacks attributed to the Macoutes
   were more likely attributable to rampant crime activity in
   Haiti.  Concluding that "it is almost inconceivable to believe
   that the Ton Ton Macoutes could be fearful of the conversations
   of 15-year-old children," the IJ held that Civil had not
   established a well-founded fear of persecution.
       We find that the Board's determination that Civil was
   not statutorily eligible for asylum was supported by
   reasonable, substantial, and probative evidence.  The Board,
   via the IJ's opinion, reasonably found that petitioner's fears
   of persecution on account of her pro-Aristide political views
   were not well founded and that she had failed to establish that
   she reasonably fears persecution on account of her membership
   in a social group of Haitian youth who possess pro-Aristide
   political views.
       As the IJ noted, petitioner belonged to no political
   organizations, and she never marched in pro-Aristide
   demonstrations.  In addition, she was never detained,
   interrogated, threatened, or physically harmed by anyone in
   Haiti because of her private wish to see Aristide restored to
   power.  The most that petitioner showed was that some
   individuals threw rocks at her family's house late one evening,
   after one of her grandmother's regular customers had overheard
   petitioner and her friends talking about their hopes that
   Aristide might soon return to Haiti.  Although we are less
   willing than the IJ to accept that the attack was as likely an
   act of crime as an instance of political persecution, the fact
   remains that petitioner admitted that the individuals who
   stoned her house did not identify themselves or say anything
   about Aristide.  In light of the great deference we must accord
   the determinations below, we will not disturb the IJ's and the
   Board's finding that there was no connection between the attack
 and petitioner's political views.   
       We find, in addition, that petitioner failed to
   demonstrate that she reasonably fears persecution on account of
   her membership in a social group of Haitian youth who possess
   pro-Aristide political views.  Although the evidence petitioner
   presented casts serious doubt on the IJ's contention that "15-
   year-old children" are unlikely targets of political violence
   in Haiti, petitioner failed to show that young students who
   hold pro-Aristide views constitute a cognizable "social group"
   within the meaning of the INA, see 8 U.S.C.  1101(a)(42)(A).  
   The term "social group" does not encompass "every broadly
   defined segment of a population."  Sanchez-Trujillo v. INS, 801
   F.2d 1571, 1576 (9th Cir. 1986).  Petitioner presented ample
   documentary evidence that young people in Haiti were not
   exempted from the general violence and unrest that occurred in
   the aftermath of Haiti's military coup, but she presented no
   evidence that such persons constitute anything other than a
   general demographic segment of the troubled Haitian population.  
   We thus reject petitioner's suggestion that the Board erred by
   not finding her eligible for asylum based on her status as a
   Haitian youth who supported Aristide.  
       Because the Board explicitly adopted the IJ's
   analysis of petitioner's individual circumstances, we conclude
   that the Board's decision -- like that of the IJ -- was
   grounded in the failure of petitioner to present sufficient
   evidence to establish a well-founded fear of persecution.  We
   therefore need not address whether the Board violated
   petitioner's due process rights by taking administrative notice
   of changes in Haiti without providing petitioner an opportunity
 to respond.   
       We accordingly affirm the decision of the BIA to deny
 petitioner's application for asylum.   
    
    
    
    
    
    
    
    
    
                        - dissent follows -

   BOWNES, Senior Circuit Judge (dissenting). I
   respectfully dissent.  The majority affirms a decision by the
   Board of Immigration Appeals (Board or BIA) concluding that
   Lucienne Civil failed to establish her eligibility for asylum
   because she had not shown a well-founded fear of persecution
   based on her political views.  At the tender age of fifteen,
   this young woman got a first-hand taste of political realities
   in Haiti.  She was overheard on the street expressing her
   support for the return to power of ousted president Jean-
   Bertrand Aristide.  For this, she was threatened with death in
   a menacing tone by a man whom she recognized and who she could
   reasonably believe knew who she was.  That same night she was
   terrorized when a group of men attacked her home, demanded
   entry, and threw stones at the house for over an hour while
   Civil and her family cowered on the floor in fear for their
   lives.  In the morning she found that her pet dog had been
   stoned to death.   
     The Board, and the majority of this panel, believed
   Civil's articulation of her subjective fear that she would be
   persecuted for her political beliefs if she returned to Haiti,
   but they concluded that these fears were nevertheless not
   "well-founded."  
     The Board incorporated "the reasons set forth" in the
   Immigration Judge's (IJ) decision to reach this conclusion, but
   the IJ's reasons were all legally erroneous.  The IJ did not
   believe Civil's fears of persecution were well-founded in part
   because Civil had not been involved in any overt political
   activity, although the mob that attacked her home did not
   appear to care whether her activities had been overt.  The IJ
   also relied on his own unsubstantiated speculation:  despite a
   wealth of evidence on the subject, he found it "almost
   inconceivable" that the anti-Aristide forces could be concerned
   enough with the "conversations of children" to make it worth
   persecuting them.  He also speculated, without any record
   support, that the terrorist attack on Civil's house was "more
   likely" the result of common criminals than of political
   persecutors.  The IJ also emphasized the fact that Aristide was
   restored to power which, the IJ apparently felt (although he
   failed actually to consider the particular facts of the
   matter), meant that Civil no longer had a legitimate reason to
   fear persecution from the government.  As will be discussed
   infra, all of these reasons are legally erroneous and
   insufficient to support the IJ's conclusion, and any decision
   based on such reasons should be reversed.  
     Further, the Board, on review of the IJ decision, took
   official notice of changes in the government of Haiti after the
   IJ decision, namely, the election of Ren Prval to succeed
   Aristide as president.  The IJ had previously taken official
   notice of changes that had taken place after the hearing but
   before his decision.  Neither the IJ nor the Board afforded
   Civil an opportunity to rebut the officially noticed facts or
   to show that any general changes in Haiti did not diminish her
   own particular well-founded fear of persecution.  The Board
   specifically acknowledged that "[t]he political changes in
   Haiti, which include the gain of power by those whom the
   applicant supports, are a significant factor in our conclusion
   that the applicant has not established a well-founded fear of
   persecution."  (Emphasis added.)  A decision based in
   significant part on a general country condition, without
   addressing whether that general condition in fact affected the
   particular individual seeking asylum, should not stand.  SeePerez-Alvarez v. INS, 857 F.2d 23, 25 (1st Cir. 1988) (The
   Board, in exercising its discretionary authority, "must
   consider and evaluate all relevant factors.").
     In my view, the IJ's analysis gave too much
   consideration to unsupported speculation and legally irrelevant
   factors, and failed to give enough thought, if any, to the
   wealth of evidence (both particular to Civil and evidence of a
   pattern of persecution) that was submitted by Civil.  The BIA's
   decision affirming the IJ   consisting of boilerplate and
   additional official notice of general material and again
   ignoring the evidence tending to support  Civil's well-founded
   fear of persecution   is likewise insufficient to do justice
 to this case under the applicable law.   
        I am concerned that the majority's affirmance of the
   BIA/IJ opinions in this case, and its deference to the agency's
   application of legal principles to the facts of this case
   (facts which are undisputed as to the incidents involving
   Civil), will encourage more such slipshod decisions by the INS.  
   The dissenting BIA judge was the only INS judge to address the
   real issues and the actual facts.  I agree with her:  "I find
   the appellant's well-asserted and supported arguments on appeal
   to be legally correct and persuasive, while I view the
   speculation of the Immigration Judge and the majority to be
   contrary to controlling law."
                         Standard of Review
        The statute stipulates that the Board's "findings of
   fact" are conclusive if "supported by reasonable, substantial,
   and probative evidence on the record considered as a whole."  
 8 U.S.C.  1105a(a)(4)(1988).  Legal issues are, of course,
reviewed de novo.
    In reviewing Board determinations of eligibility for
asylum, we have applied "normal principles of administrative
law governing the role of courts of appeals when reviewing
agency decisions for substantial evidence."  Cordero-Trejo v.
INS, 40 F.3d 482, 487 (1st Cir. 1994).  Under those principles,  
    "[t]he Board's findings must . . . be set
    aside when the record before a Court of
    Appeals clearly precludes the Board's decision
    from being justified by a fair estimate of the
    worth of the testimony of witnesses or its
    informed judgment on matters within its
    special competence or both."

Id. (alterations in original) (quoting Universal Camera Corp.v. NLRB, 340 U.S. 474, 490 (1951)).
    Here, there is no dispute as to the facts.  The Board
found Civil to be credible, and found the relevant facts to be
as she testified   including the December 1992 incident on the
street, which entailed a death threat in menacing tones, and
the stoning of her house that same night.  The IJ and Board
also credited Civil's subjective fear of persecution based on
her pro-Aristide political opinions, a fear engendered by the
verbal threat and the stoning.  Because there is no factual
dispute, the majority's deference to the Board's fact-finding
does not support an affirmance of the BIA decision.  Where, as
here, the Board applies the wrong legal standard and makes
other legal errors, it is not enough for the majority to find
that the Board could have cobbled together sufficient facts to
support its conclusion if it had applied the proper standards.  
Because the Board never did apply the correct standards, we do
not know what it, as a reasonable factfinder, would have
concluded in those hypothetical circumstances.  I would reverse
and direct a decision the other way, based on this record, but
at the very least, this court should reverse and remand for a
proper adjudication applying the correct legal standards.
    The questions in this case are questions of law:  
(1) were there enough facts to establish a "well-founded" fear
of persecution (a mixed question of law and fact which is
treated as a question of law); (2) was it error for the Board
to consider and give controlling weight to the change in
general conditions in Haiti without evaluating whether that
general change had any effect on the likelihood that this
particular individual would be persecuted based on her
political opinions if she returned to Haiti, such as would make
her continuing subjective fear of persecution no longer well-
founded?  I would answer both questions in the affirmative and
therefore reverse.
                Well-Founded Fear of Persecution
    An alien may be granted asylum in the discretion of the
Attorney General if the alien is a "refugee."  See 8 U.S.C.
1158(a).  Refugee is defined as any alien who is unwilling or
unable to return to his country "because of . . . a well-
founded fear of persecution on account of race, religion,
nationality membership in a particular social group, or
political opinion."  8 U.S.C.  1101(a)(42).  The well-founded
fear has both a subjective and an objective component.  SeeCordero-Trejo, 40 F.3d at 491 (citing INS v. Cardoza-Fonseca,
480 U.S. 421, 430-31, 440 (1987)); Alvarez-Flores v. INS, 909
F.2d 1, 5 (1st Cir. 1990); Ravindran v. INS, 976 F.2d 754, 758
(1st Cir. 1992).  "Although objective factors are relevant,
there is under the statute an 'obvious focus on the
individual's subjective beliefs.'"  Perez-Alvarez, 857 F.2d at
25 (quoting Cardoza-Fonseca, 480 U.S. at 431).   
    The subjective component requires that the asserted
fear be genuine.  Ravindran, 976 F.2d at 758.  There is no
dispute about this element in the present case; the IJ found
Civil's testimony on this subject to be credible.  The
objective component, on the other hand, contemplates that the
applicant show "'by credible, direct, and specific evidence, .
. . facts that would support a reasonable fear that the
petitioner faces persecution.'"  Id. (quoting Alvarez-Flores,
909 F.2d at 5).
    But the degree of likelihood of persecution that must
be shown is not high.  "[T]o show a 'well-founded fear of
persecution,' an alien need not prove that it is more likely
than not that he or she will be persecuted in his or her home
country."  Cardoza-Fonseca, 480 U.S. at 449-50.  The applicant
for asylum meets her burden if she shows that there is a
"'reasonable possibility'" that she will be persecuted on
account of her political opinion.  Id. at 440 (quoting INS v.
Stevic, 467 U.S. 407, 425 (1984)).  This low threshold showing
applies, even though the final decision as to whether to grant
or deny a refugee asylum is a matter of discretion, "left for
the Attorney General to decide."  Id. at 450.  As we have
stated, "[i]f one out of ten adult males in the petitioner's
country of origin is either in danger of death or of
incarceration in 'some remote labor camp,' the petitioner has
'a well-founded fear' of persecution."  Perez-Alvarez, 857 F.2d
at 25 (quoting Cardoza-Fonseca, 480 U.S. at 431); Blanco-
Comarribas v. INS, 830 F.2d 1039, 1042 (9th Cir. 1987); cf.Cardoza-Fonseca, 480 U.S. at 449 (referring to the
"longstanding principle of construing any lingering ambiguities
in deportation statutes in favor of the alien.").   
    The reasonableness of Civil's subjective fear is to be
determined by the consistency, detail and specificity of the
objective evidence she presented which provides a plausible
account of the basis for the fear and shows that there is a
"reasonable possibility" of persecution.  See Cardoza-Fonseca,
480 U.S. at 440.  The Board has set forth four factors which
must be satisfied to establish that her fear of persecution is
well-founded: (1) she possesses a belief or characteristic that
the persecutor seeks to overcome; (2) the persecutor is aware
or could become aware that she possesses the belief or
characteristic; (3) the persecutor has the capability of
punishing her; and (4) the persecutor has the inclination to
punish her.  See Matter of Mogharrabi, 19 I & N Dec. 439, 446
(BIA 1987).   
    Based upon my reading of the record, Civil meets this
standard.  She was talking with a friend about her desire for
the speedy return of then-deposed president Aristide when a man
approached her and warned her in a menacing tone not to talk
about "these things.  There are a lot of people who don't like
Aristide and they can kill you.  Aristide can't do anything for
you now."  The man wore the kind of boots that the Ton Ton
Macoutes usually wear.  Civil reasonably believed, based on the
circumstances of the meeting and the exchange that occurred
within it, that this man was associated with the anti-Aristide
forces, possibly a member of the paramilitary or an informant
for the Ton Ton Macoutes.   
    The very same night, at about 3:00 a.m., a group of men
gathered outside her house and demanded entry.  The family lay
flat on the floor in the hopes of avoiding gunfire, while the
men threw rocks at the house for an hour or more.  The family
waited until morning to get up from the floor and go outside,
where Civil found that her pet dog had been killed by stones
thrown by the men.  Civil reasonably believed that the group of
men who attacked her house were also connected to the anti-
Aristide forces, and that this entire attack was a planned
sequel to the warning and threat by the man who had overheard
her pro-Aristide comments earlier that day.  As the dissenting
BIA judge noted, no entities in Haiti are reported to engage in
this type of attack, other than the former military or right
wing, anti-democratic forces such as the FRAPH, each of which
have an established political agenda, which includes silencing
persons such as Civil.  (Dissent at 3.)  It was after this
attack that Civil's family decided that she should leave Haiti
for her safety.
    Civil's fear of persecution was eminently "reasonable,"
in light of the severity of the attack on her house and the
timing of it.  See Cardoza-Fonseca, 480 U.S. at 440.  Any
reasonable person in Civil's circumstances would have
recognized and feared that the almost instant retribution
inflicted upon her was because of her stated enthusiasm for the
return of Aristide to power.  The man who overheard her and
threatened her was a regular customer at her grandmother's
store, so he knew exactly who she was and where to find her.  
Civil has offered uncontested evidence, which the IJ found
entirely credible, regarding the events giving rise to her fear
of persecution.  The IJ accepted her rendition of those events,
as well as her subjective fear of persecution.
    In addition to her own testimony about this personal
incident, Civil offered documentary evidence of political
persecution of elementary and secondary students by the Haitian
military and paramilitary forces.  See Dennis Nurske, Lutheran
Immigration and Refugee Service, United States Catholic
Conference/Migration and Refugee Service, At Special Risk:  The
Impact of Political Violence on Minors in Haiti (July 1992)
(detailing the consistent and systematic political retribution
directed at young Haitian adolescents).  The report points out
that children and youth in Haiti played a major role in
Aristide's election campaign and in political activities both
before and after the 1991 military coup that drove Aristide out
of office.  As a result, elementary and secondary school
children have become highly politicized and are regarded by the
military as a significant threat, thus placing them at special
risk.  Id. ("Children and young adolescents have . . . been
consistently and methodically singled out by the army.").  
"Children have been routinely targeted for violence in reprisal
for their political beliefs, expressed or imputed, and for the
political opinions and activities of family and community
members."  Id.  "Children also appear to have been targeted as
punishment for a perceived political opinion imputed from their
peer association, presence in the classroom, affiliation with
a pro-Aristide neighborhood, or membership in a politicized
family."  Id.  In many rural areas, because of the intimacy of
villages and knowledge of who holds opposing viewpoints, "the
great majority of young people in the region [were] either
arrested or in hiding."  Id.  Even the INS recognized that, in
order to suppress the political activities of school-age
children, the military had "prohibited student meetings,
arrested and detained students, and brutally beaten and in some
cases tortured suspected student activists."  Memorandum from
John W. Cummings, Acting Director, INS Office of International
Affairs, to INS Asylum and Refugee Divisions, Re:
Considerations When Adjudicating Haitian Refugee/Asylum
Applications (March 9, 1993) ("Cummings Memorandum").
    Civil also offered reports of various human rights
organizations, as well as newspaper articles, detailing the
Haitian military and paramilitary forces' brutal and widespread
persecution of persons believed to support Aristide.  The
United States State Department recognized that, after the 1991
military coup, "[t]he military and the de facto government
promote[d] repression and terror, sanctioning widespread
assassination, killing, torture, beating, mutilation, and
rape."  United States Department of State, Human Rights in
Haiti (September 13, 1994).  In particular, demonstrations in
support of Aristide were attacked by the Ton Ton Macoutes,
causing hundreds of deaths.  Id.  The State Department
concluded that, "[a]s we approach[ed] the third anniversary of
the coup [overthrowing Aristide], the human rights situation
ha[d] worsened."  Id.  It is noteworthy that these words were
written just five months before the IJ's decision in the
present case.   
    Civil offered human rights reports by the United
Nations, the State Department, Amnesty International, and other
international human rights organizations documenting the
Haitian military and paramilitary forces' widespread use of
rape and sexual violence as a means of political terror in
Haiti.  The Board itself, in Matter of D-V-, Interim Decision
3252 (BIA 1993), recognized that young women in Haiti were
being subjected to rape as a form of politically motivated
persecution.  Civil offered evidence that two women in her own
neighborhood had been raped by paramilitary forces who invaded
their homes in the middle of the night and violently attacked
them.  Both were Aristide supporters.  These incidents,
grounded in objective reality, contributed to Civil's fear that
she too would be similarly persecuted.
    The record includes reports   from sources ranging from
the State Department to the United Nations to the INS to Human
Rights Watch   indicating that persons overheard in the street
protesting political conditions had been the victims of
politically motivated retribution; that thefts, robberies, and
rapes by Ton Ton Macoutes were common in areas where pro-
Aristide supporters were situated, although the "untangling of
motives of lawbreakers is difficult."  See, e.g., State
Department letter dated March 11, 1994, at 3.   
    Civil also offered evidence documenting the continuing
persecution of those opposed to the Haitian military even afterAristide's return to power in October 1994.  We recently
referred to some of the same reports that Civil points to here,
finding that "political assassinations and intimidation of
Aristide supporters persist[ed]" after the September 1994
return of Aristide to power.  Fergiste v. INS, 138 F.3d 14,
___, 1998 WL 99690, at *4 (1st Cir. 1998).  A memorandum issued
by the INS's own Asylum Division concluded that Aristide's
return had not resulted in durable, fundamental change.  
Memorandum from Gregg Beyer, Director, INS Asylum Division
(October 27, 1994) ("Beyer Memorandum").  Evidence from
reliable authorities indicates that the government was not
sufficiently stable to control the anti-Aristide forces and to
prevent them from killing and maiming with impunity, even after
Aristide was restored to the presidency.  This was especially
true in rural areas.  Nor is this surprising.  "In countries
with long histories of severe political repression and serious
violations of fundamental human rights, the possibility of
abuse and persecution continues at local levels even when
official policies and/or composition of governments at the top
have changed."  Id.
    We have previously recognized "the importance of
documentary evidence" such as I have just described, "both in
providing a plausible context for an asylum applicant's claim,
and in making credibility assessments."  Cordero-Trejo, 40 F.3d
at 491.  It is equally useful in evaluating whether her
subjective (undisputed) fear of future persecution is well-
founded.  Moreover,  "[t]he Board nowhere suggests that this
evidence is unreliable, and [I] note that it comes from
sources, such as the State Department and internationally
recognized non-governmental organizations, generally regarded
by courts of law as reliable."   Id. at 491 n.6.  Here, as in
Cordero-Trejo, "[b]oth the [immigration] judge and the Board
failed to address much of [the applicant's] evidence.  With all
deference, it is far too extensive and significant to be
dismissed with a general statement," id. at 492, or, in Civil's
case, with no statement at all.  This failure, and the Board's
failure "to engage in the inquiry necessitated" by law,
"unreasonably eviscerate[d] [the applicant's] attempt to
establish . . . the objective . . . element[] of [her] asylum
claim."  Id. at 491-92; see Perez-Alvarez, 857 F.2d at 25
("[T]he Board in exercising the discretionary authority
conferred upon it by Congress cannot proceed arbitrarily and
must consider and evaluate all relevant factors.").
    There being no factual issues genuinely in dispute, the
only question is a legal one:  do the totality of facts rise to
a sufficient level of threat to establish that Civil's fear is
"well-founded"?  I believe they do, whether the standard is ten
percent, Perez-Alvarez, 857 F.2d at 25, or somewhat greater.
    It was quite reasonable for a person who experienced
what Civil did   an attack on her home on the very night after
she was overheard expressing her pro-Aristide views and after
a stranger warned her in menacing tones about the deadly
consequences of such expression   viewed in the context of the
situation in the country at large, to fear that, if she is
returned to Haiti, she will be persecuted on account of her
political beliefs.  Her fear is even more reasonable if we
take into account the subjective impact these events would
likely have on the mind of Civil as a young teenager.  SeeKahssai v. INS, 16 F.3d 323, 329 (9th Cir. 1994).  The terror
that she experienced probably had a far greater and more long-
lasting impact on someone of her age than it would have had on
a full-grown adult.  The IJ and the Board did not consider this
factor at all.  See also Beyer Memorandum to INS Asylum
Division (Even more significant than the ongoing killings is
"the continuing, often 'invisible,' presence of these
perpetrators of past violations who have simply, and probably
only temporarily, retreated into the background.").  In short,
based on both subjective and objective factors, no reasonable
fact-finder could have concluded that Civil's fear of
persecution was not well-founded.  See Cordero-Trejo, 40 F.3d
at 491.  
    This is not a case where a petitioner is pointing to
random or widespread violence affecting all citizens and trying
to bootstrap that into a claim of persecution based on her
political beliefs under the immigration laws.  See Ravindran v.
INS, 976 F.2d 754, 759 (1st Cir. 1992) (citing Rodriguez-Riverav. United States Dep't of Immigration & Naturalization, 848
F.2d 998, 1005 (9th Cir. 1988); Mendez-Efrain v, INS, 813 F.2d
279, 282-83 (9th Cir. 1987)).
    The IJ decision relied heavily on, and the INS makes
much of, the fact that Civil did not "belong to [any] political
organizations" and did not march in pro-Aristide demonstrations
to make manifest her political opinions.  But this does not
affect her reasonable fear of persecution, and it certainly
does not necessarily lead to the Board's conclusion that
Civil's fear of persecution is not well-founded.  "Although
those in leadership or prominent positions are possibly at
greater risk due to their greater visibility, lack of
prominence does not remove the possibility of being at risk.  
This is true especially considering the fact that Haitian
society is organized into small communities."  Cummings
Memorandum to INS Asylum Division (emphasis added).  Whatever
actions she did not take, Civil apparently did enough to
warrant being threatened for her statements, to have her house
stoned in the middle of the night (at 3:00 a.m.), and to have
her dog killed.  What more is necessary in order for a person's
fear to be "reasonable"?  The fact that she was cautious enough
(because of a reasonable fear of persecution) to try not to
reveal her political sympathies in any overt manner   thereby
protecting her from the fate of her raped and abused friends   
does nothing to undermine the legitimacy of her fear now.  That
is because now, after the incident in December 1992, the anti-
Aristide forces know her sympathies lie with Aristide and those
same friends.  Those forces threatened her with death
immediately after she expressed her views, and that same night
they terrorized her sufficiently for her to know that their
threats were real.
    The majority is "at a loss" to understand Civil's
argument that she need not show that she fears persecution from
the government.  The reason she makes that argument is that the
BIA's main argument for rejecting her application is that the
government of Haiti has changed, that Civil's idol, Aristide,
and his followers have returned to government power.  The IJ's
reasoning certainly implies that Civil was required to show
that she fears persecution from the Haitian government.  Civil
argues as she does because the INS obviously does not "get it";
Haiti is not a safe place for a known Aristide supporter to
return to, even though the INS is correct that Aristide's party
is in nominal control of the government.  One may have a well-
founded fear of persecution by a group that the government is
unwilling or unable to control.  What matters is whether the
petitioner's fear of persecution is based on one of the
statutory grounds.  Matter of Maldonado-Cruz, 19 I & N Dec. 509
(BIA 1988); see, e.g., Bolanos-Hernandez v. INS, 749 F.2d 1316
(9th Cir. 1984).  As we put it in Cordero-Trejo, 40 F.3d at
490, Civil "is not claiming to have been targeted and
threatened by the civilian government, but by a shadowy, extra-
legal entity associated with the [Haitian] military."  As the
State Department recognized, in a February 1994 dispatch
contained in the record, "[p]aramilitary personnel in civilian
clothes . . . conduct most of the intimidation and violent
repression for both the police and the army" in Haiti.  And the
documentary evidence clearly establishes that the Haitian
government was unable to control the paramilitary forces and
their allies, including the Ton Ton Macoutes, who continue to
terrorize the Haitian people.  See, e.g., Human Rights
Watch/Americas National Coalition for Haitian Refugees, Terror
Prevails in Haiti:  Human Rights Violations and Failed
Diplomacy (April 1994) (quoting United Nations/Organization of
American States International Civilian Mission Report).  
                    Reliance on Speculation
    The IJ committed another legal error by basing his
conclusion in significant part on his own unsubstantiated
speculation and ignoring the substantial evidence to the
contrary that existed in the record.  We have unequivocally
rejected the substitution of the IJ's idea of how other
societies operate as a basis for judging the likelihood of
persecution of a particular individual.  See Cordero-Trejo, 40
F.3d at 490 (finding it "apparent that the IJ did not consider
Cordero's testimony and evidence," despite the legal
"require[ment]" that he consider it if credible in light of
general country conditions (citing 8 C.F.R.  208.13(a)));
Perez-Alvarez, 857 F.2d at 24 (finding that nothing in the
record sustains the IJ's assumptions other than "perhaps his
general perception of life or political conditions in El
Salvador which may or may not be grounded in fact").
    Here, the IJ's decision relied on at least two types of
speculation.  First is his speculation that the anti-Aristide
forces could not possibly have been interested in the political
views of a 15-year-old child like Civil.  He wrote that "it is
almost inconceivable to believe that the Ton Ton Macoutes could
be fearful of the conversations of children."  But the record
contains absolutely no evidence that the military or anti-
Aristide forces felt teenagers were not a threat to opponents
of Aristide.   
    Indeed, as demonstrated supra, the record evidence is
to the contrary:  the anti-Aristide forces viewed pro-Aristide
young people as an important source of support for Aristide,
and they went to great lengths to intimidate those young people
through terror and torture.  The objective evidence of record
indicates that the military and anti-Aristide forces in Haiti
did not spare minors or differentiate among their victims based
on age or gender.  Record evidence, including a letter from the
United States Department of State, dated March 11, 1994,
confirms that in the summer of 1992, there were serious
confrontations between the pro-Aristide students and police
employed by the forces which had ousted Aristide.  Further
disturbances at the universities forced them to be closed in
December 1992, the very period when the incidents reported by
Civil occurred.  Moreover, documents in the record establish
that similarly situated Haitian students have faced a pattern
of brutal persecution ranging from arrest to murder, further
substantiating Civil's fear that she faces a substantial risk
of persecution if returned to Haiti.
    We have held in past cases that "deference [to the
Board] is not due where findings and conclusions are based on
inferences or presumptions that are not reasonably grounded in
the record,  viewed as a whole."  Cordero-Trejo, 40 F.3d at
485, 487 (remanding, because "the findings underlying the
Board's conclusion that [applicant] is ineligible for asylum
are not supported by substantial evidence") (citing Universal
Camera, 340 U.S. at 491).  That is the case here.  For the IJ
to rely on his own speculation and assumptions, and to ignore
the substantial factual evidence from objective sources that
his assumptions were inaccurate, constituted legal error.  And,
to the extent the BIA affirmed the IJ "for the reasons set
forth" in his decision, the BIA committed legal error too,
relying on speculation that was unreliable and ignoring or
failing to credit detailed evidence from reliable and objective
sources.  This court certainly should not rely on the IJ's
factual conclusions in this case.
    The IJ also speculated that the attack on Civil's home
was "more likely" the [random] act of common criminals than an
act of paramilitary forces intended as political persecution.  
But there is no reason to believe that this second instance of
IJ speculation has a factual basis.  As noted supra, no
entities in Haiti were reported to engage in this type of
attack, other than the former Ton Ton Macoutes and their
successors.  There is no evidence in the record that the
Macoutes invaded and stoned people's homes in the middle of the
night for purely criminal motives.  To the contrary, there is
ample evidence that the paramilitary Ton Ton Macoutes and
"attachs" engaged in this type of persecutory practice as a
means of silencing and assessing vengeance against Aristide
supporters.  Moreover, the IJ's speculation that the 3:00 a.m.
attack on Civil's home might have been the work of "common
criminals" is absurd on its face.  A common criminal does not
knock on the door and demand to be let into the house.  The
question, in any event, is not what an administrative law judge
sitting in the safety of the United States can choose to
believe; the question is what a young person, who has been
forced to hide under the bed in the middle of the night, in
terror of being killed, would think about her safety if she
were to return home.  The IJ's "common criminals" speculation,
like the speculation about "the conversations of children,"
constituted legal error, and undermined the reliability of his
decision.  It also therefore undermined the reliability of the
Board's decision which simply incorporated by reference the
IJ's reasoning.
    The majority discounts the error resulting from the
Board's and IJ's speculation, stating "we think it is readily
apparent that the IJ did rely on record evidence, including
petitioner's testimony, her asylum application and affidavit,
and a State Department advisory report."  Ante at 10 n.3.  But
the fact that the IJ mentioned some record evidence does not
mean that he did not rely on unsubstantiated assumptions as
well.  He explicitly stated that he did rely on a number of
such assumptions, such as his "common criminals" speculation
and his reliance on general changes in Haiti apparently
assuming that such general changes would eliminate the
possibility that this petitioner would be persecuted.  And the
Board, in affirming the IJ, acknowledged that the same general
political changes "are a significant factor in our conclusion
that the applicant has not established a well-founded fear of
persecution."  
    Thus, Civil has offered evidence to establish
sufficient facts to satisfy the legal test for having a well-
founded fear of persecution.   
                        Official Notice
    In addition, she is correct that the BIA's decision
should be reversed as a matter of law because that decision was
made on the basis of the IJ's and the Board's taking official
notice of changes in general country conditions.  That official
notice gave rise to two separate legal errors.  As this court
emphasized only last month, "the official notice of changed
country conditions" cannot be enough to "counter[] the specific
evidence of persecution that [a particular petitioner] has
presented."  Fergiste v. INS, 138 F.3d 14, ___, 1998 WL 99690,
at *3 (1st Cir. 1998).  In a separate and independent error,
discussed infra, the Board also failed to give Civil any
warning that it would be considering this extra-record evidence
and failed to give her an opportunity to respond before the
final decision issued.  See Gebremichael, 10 F.3d at 37.
                A. General Versus Specific Facts
    First, the IJ and the Board took notice of a
generalization, without any evidence that there has been any
specific diminution in the threat to this particular individual
petitioner.  As the majority notes, the BIA "devoted the bulk
of its analysis of Civil's asylum application to reciting
virtually verbatim a discussion of changed country conditions
set forth in an earlier opinion."  Ante at 8.  While taking
official notice of the general changes in country conditions in
Haiti, the Board gave absolutely no consideration to the
question whether those general conditions made any difference
(much less sufficient difference) to Civil's particular
situation.  The Board's implicit assumption, that the
particular necessarily follows from the general, is also
factually inaccurate:  despite the return of Aristide and then
Prval to head Haiti's government, the former Ton Ton Macoutes
continue to terrorize Aristide's friends and supporters.
    As we have held, "[i]n keeping with standard principles
of administrative procedure and in the absence of any
prohibition in the INA itself, the Board has the discretion to
take 'official' or 'administrative' notice of extra-record
legislative facts."  Gebremichael, 10 F.3d at 37 (emphasis
added) (citing 3 Kenneth C. Davis & John P. Wilson,
Administrative Law Treatise  15, at 132-217 (2d ed. 1980)
("Administrative Law Treatise")).  "Legislative facts are those
which 'do not usually concern the immediate parties but are the
general facts which help the tribunal decide questions of law
and policy and discretion.'"  Id. at 37 n. 25 (quoting 2
Administrative Law Treatise  12:3, at 413).  "Thus, the Board
is free to take official notice of facts such as a change in
government in an applicant's home country."  Id. at 37.   
    "In contrast, 'adjudicative facts usually answer the
questions of who did what, where, when, how, why, with what
motive or intent.'"  Id. at 37 n.25 (quoting Administrative Law
Treatise 12:3, at 413).  These more particularized facts
pertaining to the individual parties are not the kind of facts
of which the agency may take official notice.  Yet that is
exactly what the Board would have to do in order to have made
a proper determination in the instant case.   
    As a matter of law, it is not enough for the Board to
find, as an officially noticed fact, that Aristide was restored
to power and therefore that the "general country conditions" in
Haiti had changed.  A change in government cannot, without
more, support a denial of political asylum.  The Board must
find, based upon substantial evidence, that the change has
actually resulted in an elimination or reduction of persecution
of the particular applicant for asylum, or of persons similarly
situated; an applicant is entitled to "careful, individualized"
consideration of such evidence in the context of the
applicant's claims.  See Llana-Castellon v. INS, 16 F.3d 1093,
1096, 1098 (10th Cir. 1994) (remanding to BIA a denial of
asylum based upon a "rote" finding of changed country
conditions); see Rhoa-Zamora v. INS, 971 F.2d 26, 34 (7th Cir.
1992).  As the Tenth Circuit cogently stated,  
    The use of official notice [of changed country
    conditions] does not substitute for an
    analysis of the facts of each applicant's
    individual circumstances.  Uncontroverted
    facts may be inapplicable to or of limited
    probative value in individual cases and the
    Board must remain open to this possibility.  
    The petitioners are therefore right to demand
    that the BIA engage in a careful,
    individualized review of the evidence
    presented in their applications and hearings.

Llana-Castellon, 16 F.3d at 1098 (quoting Kaczmarczyk v. INS,
933 F.2d 588, 594-95 (7th Cir. 1991)).  The court found that
the Board there (as here) inferred a de facto change in country
conditions from a merely de jure change in government, and
failed to consider that the government does not enjoy full
control and that anti-government groups "are still a force to
be reckoned with."  Id. at 1097; Castillo-Villagra v. INS, 972
F.2d 1017 (9th Cir. 1992) (Although the Board may take
administrative notice of the fact of a change in government, it
may not, without a hearing, conclude that the change has
eliminated the danger to the applicant.)
    We reached the same conclusion only last month.  In
Fergiste, we held:  
    [T]he Board's administrative notice of changed
    country conditions did not suffice to show
    that [the petitioner] himself no longer had a
    reasonable fear of future persecution.  
    Abstract "changed country conditions" do not
    automatically trump the specific evidence
    presented by the applicant.  Rather, changes
    in country conditions must be shown to have
    negated the particular applicant's well-
    founded fear of persecution.

138 F.3d at ___, 1998 WL 99690, at *4 (emphasis added, footnote
omitted); see 8 C.F.R.  208.13(b)(1)(i).  In Fergiste,
referring to some of the same reports that Civil points to
here, we found that "political assassinations and intimidation
of Aristide supporters persist[ed]" after the September 1994
return of Aristide to power.  138 F.3d at ___, 1998 WL 99690,
at *4.  There, we noted that, although the petitioner
"presented hundreds of pages of documentary evidence that
either contradicted the Board's conclusions or placed them into
question[,] . . . the Board mentioned none of them in its
analysis, nor did it discuss how or whether [the petitioner's]
particular situation may be affected by the changed country
conditions that it recognized."  1998 WL 99690, at *4.   
    Similarly, here, the question the Board should have
answered was whether Civil in particular had a well-founded
fear of persecution.  Neither the Board nor the IJ did anything
whatsoever to ascertain whether the general political change in
Haiti made any difference to Civil's well-founded fear of
persecution from the Ton Ton Macoutes and their sympathizers.
    If, in the instant case, the Board or IJ had made any
effort to look into this question, they would have found an
abundance of evidence supporting Civil's claim that she still
had reason to fear persecution.  As discussed supra, despite
the change at the top of the government in Haiti, members of
the police force and civilian former Ton Ton Macoutes continued
to prowl the country intimidating, torturing and killing
Aristide supporters and their families.  In short, the deadly
battle for control of Haiti continued to be waged even after
the general changes occurred at the top of the government.  The
Board's failure even to ask the particular question of Civil's
personal well-founded fear of persecution, i.e., the Board's
leaping to the conclusion of denying her petition simply based
upon the general change in country condition, was erroneous as
a matter of law and should be reversed.  It is not a
legislative fact of which the Board was permitted to take
official notice, nor did the Board make any attempt to
determine objectively a particularized finding based on such
fact.     It was particularly unfair for the IJ to base his
decision on changed country conditions stated in excerpts of
the U.S. State Department Country Reports on Haiti, and then to
ignore the voluminous documentary evidence presented by Civil
in support of her case.  She offered reports of reputable,
objective organizations, including some from the State
Department and INS itself, attesting to the fact that the
change at the top did not automatically free individual
Aristide supporters from persecution.  The IJ should not have
drawn the conclusions he did from his official notice, without
considering evidence in the record to the contrary.
    The Board, too, relied not only on the same general
conditions on which the IJ relied, but took official notice
itself of additional changes in the Haitian government, notably
the election of Ren Prval to succeed Aristide.  Like the IJ,
the Board relied on the general to overcome Civil's showing of
specific facts on the particular, while giving her no
opportunity to rebut or to demonstrate that the general country
conditions did not allay her well-founded fears.  Moreover, on
their face, the Board's general facts are not sufficient to
support its conclusion that the persecution of Aristide
supporters actually diminished.  The Board stated that "the
rise to power by democratic forces, and the significant efforts
made to dismantle the former military structures, have a direct
impact on asylum claims from Haiti."  (Emphasis added.)  
Similarly, the IJ relied on recent developments in Haiti as
"provid[ing] a basis for hope that conditions in the country
soon might improve."  (Emphasis added.)  The fact that
"significant efforts" are being made to dismantle the former
military structures and to prevent further atrocities against
Aristide's supporters does not mean that those efforts are
successful.  The question that the Board was required to answer
was whether this particular individual had a well-founded fear
of persecution, not whether, in general, there was any "hope"
that conditions in Haiti "might improve" or whether
"significant efforts" were being made to protect people like
her.
    As in Fergiste, the Board majority's reliance on
official notice of generalized changed country conditions,
instead of a particularized finding as to this individual
petitioner, constitutes "legal error [which] undermines the
Board's decision."  1998 WL 99690, at *3.  Viewing the  record
as a whole, including evidence on both sides of the question,
the record does not contain substantial evidence to support the
Board's implicit conclusion that the changes in general country
conditions meant that Civil's fear of persecution is not well-
founded.  The Board's decision should be reversed, and the case
remanded for the IJ to determine whether Civil is entitled to
asylum as a matter of the discretion of the Attorney General.  
Fergiste, 138 F.3d at ___, 1998 WL 99690, at *4; see 8 U.S.C.
1158 (b)(1) (granting discretion to the Attorney General).
                         B. Due Process
    Even if the Board were permitted to take official
notice of the change in country conditions, and even if the
Board could extrapolate from those facts a particularized
conclusion as to whether Civil herself continued to have a
well-founded fear of persecution despite the change in country
conditions, there is a question whether the Board violated
Civil's right to due process under the Fifth Amendment by
relying on extra-record facts without affording her notice or
an opportunity to be heard on this new evidence.   
    "It is well settled that an alien in a deportation
proceeding is entitled to procedural due process."  
Gebremichael, 10 F.3d at 38.  This is especially important in
light of the fact that "an alien's freedom to stay in this
country hangs in the balance."  Id.  The question is "what
process is due when the Board chooses to take official notice
of conditions in the applicant's home country."  Id.  In
answering this question, we recognized the conflict in the
circuits, and went on to agree with the position taken here by
the government that "the motion to reopen process can
ordinarily satisfy the demands of due process."  Id.   
    While reaching this conclusion, we nevertheless
recognized that not all cases are "ordinary," and that the
question of whether the motion to reopen process will satisfy
the constitutional demands of due process "will, as always,
ultimately depend on the circumstances."  Id. at 39 (citing
Mathews v. Eldridge, 424 U.S. 319, 324 (1976)).  We alluded to
the Administrative Law Treatise for the proposition that "[t]he
sound practice for both courts and agencies would be one of
full liberality in allowing the free use of legislative facts
. . . along with strictness in requiring that parties be given
a predecision chance to respond to whatever extra-record facts
are relied upon."  Administrative Law Treatise  12:4, at 320
(Supp. 1989), quoted in Gebremichael, 10 F.3d at 38-39.  We
noted one important example of why predecision input from the
applicant is so critical:  the applicant  
    is ordinarily entitled "not only to refute
    but, what in this situation is usually more
    important, to supplement, explain, and give
    different perspective to the facts upon which
    the agency relies."  

Gebremichael, 10 F.3d at 38 n. 28 (quoting Kaczmarczyk, 933
F.2d at 596 n.7 (itself quoting 4 Jacob A. Stein et al.,
Administrative Law,  25.01 n.7 (1986))).  
    In Fergiste, 138 F.3d at ___, 1998 WL 99690, at *4 n.4,
we rejected the INS position that Gebremichael's language
regarding motions to reopen requires rejection of petitioner's
argument that due process was violated by the Board's reliance
on extra-record changes in country conditions.  The INS makes
the same argument here, and we should reject it here too.
    Thus, in Gebremichael, even though the motion to reopen
process will "ordinarily satisfy the demands of due process,"
we held that the petitioner's due process rights were violated
because he was not "afforded an adequate opportunity to
respond" to the general facts of which the Board took
administrative notice.  10 F.3d at 39.  We were troubled by
the fact that "[t]he Board did not warn petitioner of its
intention to use extra-record materials," nor "did petitioner
have a predecision opportunity to respond."  Id.   
    Here, too, Civil was not warned that the Board intended
to consider the changes in Haiti's government in general as a
ground for rejecting her claim that she had a well-founded fear
of persecution.  Nor was she afforded an opportunity, beforethe IJ made his decision, "not only to refute but, what in this
situation is usually more important, to supplement, explain,
and give different perspective to the facts upon which the
agency relies."  See Gebremichael, 10 F.3d at 38 n.28 (quoting
Kaczmarczyk, 933 F.2d at 596 n.7); Llana-Castellon, 16 F.3d at
1099 ("In the circumstances of this case, where the BIA noticed
facts and made disputable inferences based on those facts which
. . . were dispositive of [p]etitioners' appeal, we hold that
due process requires the BIA to give [p]etitioners advance
notice and an opportunity to be heard."); Castillo-Villagra,
972 F.2d at 1023 (same).
    As the dissenting member of the Board pointed out,
there are a multitude of facts, including findings by the
United Nations and other objective international bodies, that
have examined the human rights situation in Haiti and have
concluded, even after the restoration of Aristide and later
Prval to the presidency, that former members of the Ton Ton
Macoutes and supporters of the former dictatorship have
continued to terrorize, torture, and kill Haitians who support
Aristide.  See supra.  The restoration to the presidency has
not been enough to control the anti-Aristide forces.
    In reaching its own conclusion based on the second
layer of administratively noticed facts   again, without giving
Civil an opportunity to respond to the disputable facts or the
inferences the Board drew therefrom   the Board (on appeal from
the IJ's decision) "abused our presumption of good faith and
ran afoul of petitioner's procedural rights."  Gebremichael, 10
F.3d at 39.   
    The Board acknowledged the significant extent of its
reliance on such officially noticed and unrebutted general
facts:  "The political changes in Haiti, which include the gain
of power by those whom the applicant supports, are a
significant factor in our conclusion that the applicant has not
established a well-founded fear of persecution."  If given the
opportunity to rebut these noticed facts, Civil would have been
able to introduce into evidence reports from the United Nations
High Commissioner for Refugees and others (including a U.N.
report issued on August 14, 1997), attesting that human rights
abuses continued to occur with regularity in Haiti, long after
Prval's election.
    Thus, while the general facts are undisputed
(restoration of Aristide, election of Prval), the inferences
regarding their impact on Civil's fear of persecution are
disputed.  In addition to violating her right to procedural due
process, this goes to the legitimacy of the basis for the
Board's conclusion, which is unsupported by the record taken as
a whole.
    Finally, as we noted in Gebremichael, "the filing of a
motion to reopen does not automatically stay deportation," id.at 39 n.29.  This factor also comes into play in the instant
case.  After the BIA's order dismissing her appeal on June 26,
1997, Civil was required to file an appeal within thirty days
under IIRIRA Sec. 309(c)(4) (Transitional Rule) in order to
seek a stay of deportation.  This is still another factor that
renders the motion to reopen process insufficient to satisfy
Civil's due process rights.
                           Conclusion
    In my view, the BIA evaluation of the facts in this
case contains improper legal analysis and is not supported by
substantial evidence in the record; it rests on unsubstantiated
speculation by the Immigration Judge.  Moreover, the IJ and BIA
made errors of law by taking official notice of changes in
generalized country conditions without considering whether
those changes would affect whether this particular individual
had a well-founded fear of persecution, and without affording
her notice or an opportunity to rebut the facts officially
noticed.  Accordingly, I believe the BIA decision should be
reversed.  I respectfully dissent.

</body>

</html>